JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY *vs.* COMMISSIONER OF INSURANCE.

Suffolk.   March 2, 1965. — June 23, 1965.

Present: WILKINS, C.J., SPALDING, KIRK, SPIEGEL, & REARDON, JJ.

*Insurance,* Agents' strike, Labor, Premium moratorium. *Labor. Strike. Constitutional Law,* Police power, Interstate commerce, Insurance, Labor. *Jurisdiction,* Federal field, Labor.

The labor relations of insurance companies carrying on an interstate business are subject to the National Labor Relations Act. [397–398]
Discussion of Federal and State control of labor relations. [398–400]
G. L. c. 175, § 187F, providing in effect, with respect to designated insurance policies for which premiums "are normally collected by insurance agents employed by the insurer," that termination or lapse of such policies by reason of default in payments due to the insurer "during the period that . . . [the] insurer's agents are on strike" shall be delayed until "thirty-one days immediately following the authorized termination of such strike," gives the agents' union such power in collective bargaining as to upset the bilateral freedom of collective bargaining between the insurer and the union desired by Congress under the National Labor Relations Act and interferes with certain rights of nonstriking agents and the insurer specifically protected by the Act, and, being in conflict with the Act, is an invalid exercise of the police power. [402–405]

PETITION for review filed in the Supreme Judicial Court for the county of Suffolk on May 15, 1964.

---

349 Mass. 390                                                        391

John Hancock Mutual Life Ins. Co. v. Commissioner of Insurance.

The case was reserved and reported by *Kirk, J.*, without decision.

*Edward J. Duggan (George E. Donovan & Daniel J. Johnedis* with him) for the petitioner.

*David W. Hays,* Assistant Attorney General, for the respondent.

*Joseph P. Rooney & Richard M. Reilly,* for Life Insurance Association of America, amicus curiae, submitted a brief.

*Donald R. Grant & David J. Blattner, Jr.,* for Metropolitan Life Insurance Company, *Frederick G. Fisher, Jr., S. Donald Gonson, & Harold Hestnes,* for Prudential Insurance Company of America, and *Edward L. Lane & Richard J. Walsh,* for Boston Mutual Life Insurance Company, amici curiae, submitted a brief.

*Irving Abramson, Everett E. Lewis, & Leonard Greenwald,* of New York, for Insurance Workers International Union, AFL–CIO, amicus curiae, submitted a brief.

KIRK, J.  This is a petition for review pursuant to G. L. c. 175, §§ 22A; 108, cl. 2 (a); 132 and 192.  The case was reported by the single justice without decision for the determination of the full court upon the pleadings, a statement of agreed facts and exhibits.

We state, in somewhat condensed form, the agreed facts. The petitioner, John Hancock Mutual Life Insurance Company (Hancock), is a mutual life insurance corporation organized under the laws of this Commonwealth.  It has been continuously engaged in the Commonwealth since 1862 in the business of life insurance and since May 15, 1957, in the business of accident and sickness insurance.  Hancock has a usual place of business in Boston and is authorized to engage in the named insurance activities in all States of the United States of America, the District of Columbia, Puerto Rico and the Virgin Islands.  The respondent is the Commissioner of Insurance (commissioner).

On April 13, 1964, Hancock, in accordance with G. L. c. 175, §§ 22A, 108, cl. 2 (a); 132 and 192, filed with the commissioner for his review and approval an endorsement

form, set out in the footnote,[1] to be issued and delivered in the Commonwealth for attachment to noncancellable disability insurance contracts (disability policies), hospital and surgical expense contracts (hospital expense policies) and life insurance policies (life policies) in the ordinary and industrial forms,[2] issued by the petitioner to individual insurants prior to and on and after February 5, 1964, which were still in force, and also to insurance policies that the petitioner would issue in the future. As to a substantial number of these policies all premiums were and would be collected by insurance agents employed by the petitioner.

On April 27, 1964, the commissioner notified the petitioner that the proposed endorsement did not comply with the laws of the Commonwealth and was therefore disapproved. Specifically, the commissioner stated that, as to insurance policies the premiums for which are normally collected by insurance agents employed by the petitioner, the reinstatement privilege contained in the endorsement was less favorable than the provisions of St. 1963, c. 796 (inserting § 187F in G. L. c. 175).[3]

---

[1] "The following provision is hereby added to the policy to which this endorsement is attached: PAYMENT OF PREMIUMS DURING A PERIOD OF STRIKE OF AGENTS OF THE COMPANY — If any premium becomes payable by the stated terms of the policy during the period of a strike in the state where the owner resides, which strike is authorized by the duly certified bargaining agent of licensed insurance agents employed by the Company, and such premium is not paid when due or by the end of the grace period, if any, expressly stated in the policy, the policy will be reinstated without evidence of insurability upon receipt by the Company at its Home Office within 60 days after the premium due date and during the lifetime of the Insured of the overdue premium with interest computed at 5% per annum to the date of reinstatement. A strike of the Company's agents shall not operate to prevent lapse of the policy if the premium is not paid when due or by the end of the grace period expressly stated in the policy, if any, and any such strike shall not result in any different or additional grace period than that which is expressly stated in the policy nor any additional period within which reinstatement may be made without evidence of insurability than that which is expressly stated in this endorsement."

[2] Hereinafter, "insurance policies," unless otherwise limited, shall refer to the three named types of insurance policies and contracts which the petitioner has issued or intends to issue.

[3] "1. No life insurance policy, non-cancellable disability insurance contract, hospital expense or hospital and surgical expense contract, now or hereafter in force in the commonwealth, premiums for which are normally collected by insurance agents employed by the insurer, shall terminate or lapse

349 Mass. 390      393

John Hancock Mutual Life Ins. Co. *v.* Commissioner of Insurance.

Hancock prior to and on and after February 5, 1964, has issued and intends to continue to issue disability, hospital expense and life policies to individual insurants. Under the premium collection practices of Hancock all premiums on a substantial number of said policies have been collected by licensed insurance agents (debit agents) employed by it. The duties of the petitioner's debit agents, licensed in this Commonwealth under G. L. c. 175, § 163, include the collection of premiums due through personal contact with the insurants, and the petitioner intends to continue such premium collection practices.[4]

Each of the policy forms on which insurance has been issued in the Commonwealth has, since 1907, been approved or permitted for use under the applicable statutes. Each insurance policy (several examples of which are exhibits in

by reason of default in payment of any premium, installment or interest on any policy loan payable to said insurer during the period that said insurer's agents are on strike.

"2. The insured or premium payer of any policy or contract of insurance set forth in paragraph 1 shall be entitled to a grace period of thirty-one days immediately following the authorized termination of such strike, within which the payment of any premium, installment or interest on any policy loan may be made, during which period of grace the policy or contract of insurance shall continue in full force and effect.

"3. If a claim arises under the policy or contract of insurance during a strike period as set forth in paragraph 1, or during the grace period as set forth in paragraph 2, before the overdue premium, or installment or interest on a policy loan, if any, are paid, the amount of such overdue premium or installment together with interest not to exceed six per cent per annum and the amount of any loan with interest due, may be deducted from the amount payable under the policy or contract in settlement."

[4] In the year ending December 31, 1963, the premium payment methods for residents of Massachusetts on the insurance policies of Hancock were as follows:

| Debit Policies | No. of Policies | Total Premiums | Total Premiums paid to debit agents | Percentage of Total premiums paid to debit agents |
|---|---|---|---|---|
| Industrial Weekly Life | 807,280 | $16,628,580 | $13,727,580 | 82.6 |
| Industrial Monthly Life | 34,535 | 974,284 | | |
| Ordinary Monthly Life | 350,174 | 17,087,580 | 17,497,864 | 96.9 |
| Monthly Disability | 1,674 | 128,530 | | |
| Hospital Expense | 3,512 | 386,217 | 501,247 | 97.4 |
| Premium Notice Policies | | | | |
| Ordinary Life | 312,405 | 31,747,045 | 5,878,606 | 18.5 |
| Disability | 1,150 | 152,544 | | |
| Hospital Expense | 4,210 | 541,550 | 134,974 | 19.4 |

this case) describes the benefits and rights of the insured. Each provides that it is issued in consideration of the payment of premiums of amounts and at times specified therein; that premiums are due in advance of the period for which insurance benefits are provided; that payment of a premium will not operate to keep the policy in force beyond the period for which it is payable, except as provided in the period of grace provision; and that if any premium is not paid when due (or by the end of the grace period) the policy will lapse. The grace periods provided in the sample policies are four weeks or thirty-one days.

Substantially all of the ordinary life policies issued by Hancock or to be issued provide in substance that any premium unpaid at the end of the grace period shall be paid from any dividends on deposit with the company. Except for term policies, most ordinary life policies provide further that by election of the owner any premium unpaid at the end of the grace period will be paid by an automatic loan up to the loan value of the policy. Each of the insurance policies may be reinstated after a lapse for failure to pay premiums but the insurer has the right to require evidence of insurability.

All insurance policies provide in substance that payment of premiums shall be made to the petitioner at its home office or to an agent authorized to receive payment. Failure of an agent to collect a premium by personal contact does not relieve the insurant of his obligation to pay the premium when due. Except as provided in the two next preceding paragraphs none of the forms in which the petitioner has issued or intends to issue insurance policies contains any provision excusing failure or delay in the payment of premiums during the period that its agents might be on strike nor does any form provide for continuance of coverage and benefits without advance payment of premiums during the period of any such strike. The policies specify varying time intervals for the payment of the stated premiums. Some require weekly or monthly payments; others permit annual, semiannual, quarterly or monthly payments.

The petitioner annually determines whether a divisible surplus exists. A divisible surplus is that portion of the petitioner's assets which, after payment of covered claims, benefits and expenses, exceeds the amount necessary to provide for the payment of future claims, benefits and expenses. The divisible surplus so ascertained is apportioned to each class of policy with reference to the proportion which the premiums and experience contributed by that class have generated the surplus, and then paid in the form of dividends without distinction or discrimination to each insurant of the same class and life expectancy at issue. To the extent that any class is not self-supporting, the surplus contributed by other classes is applied to make up the deficiency, and the assets available for apportionment as divisible surplus among the other classes are reduced or eliminated.

Without any obligation or guaranty on its part to do so, the petitioner has assigned and intends to continue to assign debit agents employed by it to collect premiums due through personal contact with debit policyholders. Hancock employs approximately 6,100 debit agents of whom 1,022 work in the Commonwealth. To holders of premium notice policies, defined by the petitioner as all policies which do not require monthly or more frequent payment of premiums, the petitioner has mailed and intends to continue to mail notices of premiums due. From time to time some holders of premium notice policies, instead of following the usual practice of transmitting their premium payments to offices of the petitioner, pay their premiums to debit agents. Some holders of debit policies transmit their premiums directly to offices of the petitioner. The method of premium payment with respect to any particular policy is undeterminable, since the petitioner has allowed and intends to continue to allow policyholders to change their policies from debit to premium notice or vice versa if their policies fall within the policy class limit of the class to which they desire to change. As to a considerable number of policies there is a change in the method of payment over any given year.

The business of Hancock, as is that of all insurers, is governed by actuarial principles. Individuals, not knowing in advance who is going to suffer a loss, contribute to a common fund from which any member of the group suffering a loss will be paid a previously agreed amount. The premium payments to the insurer together with returns from the investment of the premiums create the common fund. The premiums are also the source for the payment by the insurer of any cash surrender value, loan and nonforfeiture benefits provided in the policies. The amount of premium charged each insurant is calculated with reference to his life expectancy and class, the benefits promised and the risks covered by his policy, the assumed return on the insurer's investments, and the amount of applicable expenses. The calculation is made in the light of statistical data reflecting actual past experience and also with regard to predictable future experience so that the premiums charged and the funds they generate will be adequate to pay the losses and benefits under the policies. Each insurant thereby contributes to the pool for his class of policy according to his chances of drawing upon the pool, and the premium charge is the same for all insurants of the same class and life expectancy who bring an equal degree of risk to the pool. The right of insurers to contest the effectiveness of policies for limited periods of time under incontestability provisions and to require evidence of insurability before reinstating lapsed policies gives an opportunity to evaluate again the class and degree of risk of the insurant.

A corollary to the principle of pooling insurance risks is the requirement that the premium be paid by the insurant in advance of the period for which insurance is provided. Such advance premium payment identifies the insurants, the risks and the benefits which are a charge against the common fund before the insurance period has begun. It makes the premiums available for payment of expenses and claims, and also for investment so that the common fund may be increased by investment returns. The advance pre-

349 Mass. 390                                              397

John Hancock Mutual Life Ins. Co. *v.* Commissioner of Insurance.

mium payment tends to assure that the common fund for each group of insurants will be adequate to satisfy the covered risks and benefits; that there will be no need to liquidate long-term investments at a loss to meet current claims; that other assets of the insurer will not be invaded to meet the insurer's obligations to any particular group of insurants; that the insurer will be able to meet its claims and benefit obligations to all groups of insurants; and that the insurer will be protected from the ultimate danger of insolvency.

This concludes our summary of the facts agreed to by the parties. Additional relevant facts, also agreed to by the parties, are indicated hereafter in the opinion by an asterisk.

The petitioner contends that G. L. c. 175, § 187F, upon which the commissioner based its disapproval of the endorsement form, is invalid as applied to the petitioner for the reason among others that it is not a proper exercise of the police power. Specifically it argues that the statute is in conflict with the National Labor Relations Act, as amended, 61 Stat. 136 et seq. (1947), 29 U. S. C. § 151 et seq. (1958).

The insurance business carried on by the petitioner is "commerce . . . among the several states" as that term is used in the Commerce Clause of the Constitution of the United States (art. 1, § 8, third clause). See *Springfield Ins. Co.* v. *State Tax Commn.* 342 Mass. 505, 508–510; *United States* v. *South-Eastern Underwriters Assn.* 322 U. S. 533. Subsequent to the decision in the *South-Eastern Underwriters* case, Congress, by passage of the McCarran-Ferguson Act, 59 Stat. 33–34 (1945), 15 U. S. C. §§ 1011–1015 (1958), made it clear that the States should retain broad powers of regulation over the business of insurance in spite of its interstate character. It was nevertheless specifically provided that "[n]othing contained in this chapter shall be construed to affect in any manner the application to the business of insurance of the Act of July 5, 1935, as amended, known as the National Labor Relations

Act . . . .'' 59 Stat. 34 (1945), 15 U. S. C. § 1014 (1958). Thus the labor relations of insurance companies are subject to the National Labor Relations Act to the same extent as those of other industries. See *National Labor Relations Bd.* v. *Insurance Agents' Intl. Union AFL–CIO,* 361 U. S. 477; *National Labor Relations Bd.* v. *Metropolitan Life Ins. Co.* 380 U. S. 438.

The petitioner, continuously since 1951, has had collective bargaining agreements, subject to the National Labor Relations Act, 1935, as amended, with the duly certified bargaining agent of the debit agents employed by the petitioner.* The yearly volume of business of Hancock is far in excess of that which would permit the National Labor Relations Board to decline to assert jurisdiction over its labor disputes. See 73 Stat. 541 (1959), 29 U. S. C. § 164 (c) (1958) (Supp. V, 1964); 1 CCH Labor Law Rep. § 1610.

Congress has seen ''fit to regulate labor relations to the full extent of its constitutional power under the Commerce Clause,'' (*Amalgamated Assn. of St. Elec. Ry. & Motor Coach Employees of America, Div. 998* v. *Wisconsin Employment Relations Bd.* 340 U. S. 383, 391), yet it has left ''much to the states, though Congress has refrained from telling us how much.'' *Garner* v. *Teamsters, Chauffeurs & Helpers Local Union No. 776* (*A. F. L.*) 346 U. S. 485, 488. By force of the Supremacy Clause (art. VI, second paragraph) of the Federal Constitution any State law or action which conflicts with the Federal enactments is invalid. *International Union of United Auto. Aircraft & Agricultural Implement Wkrs. of America, C. I. O.* v. *O'Brien,* 339 U. S. 454, 458–459. *Amalgamated Assn. of St. Elec. Ry. & Motor Coach Employees of America, Div. 998* v. *Wisconsin Employment Relations Bd.* 340 U. S. 383, 389–390. *Division 1287, Amalgamated Assn. of St. Elec. Ry. & Motor Coach Employees of America* v. *Missouri,* 374 U. S. 74, 81–82.

Congress has expressly given to the States power over some matters relating to labor relations (see, e.g., 61 Stat. 151 [1947], 29 U. S. C. § 164 [b] [1958], permitting States

349 Mass. 390                                         399

John Hancock Mutual Life Ins. Co. v. Commissioner of Insurance.

to have union security statutes more restrictive than Federal law, and 61 Stat. 146 [1947], 29 U. S. C. § 160 [a] [1958], authorizing the National Labor Relations Board to cede jurisdiction to State labor relation agencies over limited classes of "local industry" if the State law is consistent with the Federal). General Laws c. 175, § 187F, is not within any express grant of power to the States. It is rather within what has been called a "penumbral area [which] can be rendered progressively clear only by the course of litigation." *Weber* v. *Anheuser Busch, Inc.* 348 U. S. 468, 480–481.

As a result of considerable labor litigation, some aspects of the State-Federal relation have become clear. In enterprises covered by the National Labor Relations Act, matters of representation are exclusively under Federal control. *Bethlehem Steel Co.* v. *New York State Labor Relations Bd.* 330 U. S. 767. *La Crosse Tel. Corp.* v. *Wisconsin Employment Relations Bd.* 336 U. S. 18. Similarly the Federal laws apply exclusively if the conduct involved constitutes an unfair labor practice. *Garner* v. *Teamsters, Chauffeurs & Helpers Local Union No. 776 (A. F. L.)* 346 U. S. 485, 501. *Weber* v. *Anheuser-Busch, Inc.* 348 U. S. 468. But see *International Union, United Auto. Aircraft & Agricultural Implement Wkrs. of America (UAW–CIO)* v. *Russell,* 356 U. S. 634, 655 (dissenting opinion). The right to strike is federally protected and may not be impaired by State law. 61 Stat. 151 (1947), 29 U. S. C. § 163 (1958). *International Union of United Auto. Aircraft & Agricultural Implement Wkrs. of America, C. I. O.* v. *O'Brien,* 339 U. S. 454, 456–457. *Amalgamated Assn. of St. Elec. Ry. & Motor Coach Employees of America, Div. 998* v. *Wisconsin Employment Relations Bd.* 340 U. S. 383, 389–398. The right to strike is not without limit, however (see 61 Stat. 141 [1947], 29 U. S. C. § 158 [b] [4] [1958], and some types of work stoppages are outside Federal protection and subject to State control. *International Union, United Auto. Wkrs. of America, A. F. of L., Local 232* v. *Wisconsin Employment Relations Bd.* 336 U. S. 245.

States may also restrain or punish conduct which threatens the domestic peace and order. *Thayer Co.* v. *Binnall,* 326 Mass. 467, 480–481. *Binnall* v. *Thayer Co.* 335 Mass. 150. *Allen-Bradley Local 1111, United Elec. Radio & Mach. Wkrs. of America* v. *Wisconsin Employment Relations Bd.* 315 U. S. 740, 749–751. *Youngdahl* v. *Rainfair, Inc.* 355 U. S. 131, 138, 139. *International Union, United Auto. Aircraft & Agricultural Implement Wkrs. of America (UAW–CIO)* v. *Russell,* 356 U. S. 634.

General Laws c. 175, § 187F, does not operate in a field which litigation has shown to be clearly within Federal or clearly within State control. Its validity therefore must be determined by the extent to which its operational effects are in conflict with the purposes and policy of the Federal labor laws. In determining whether it conflicts with the National Labor Relations Act, it is irrelevant that the State statute was enacted for purposes not related to labor relations. *Weber* v. *Anheuser-Busch, Inc.* 348 U. S. 468, 479–480.

"Collective bargaining, with the right to strike at its core, is the essence of the federal scheme." *Division 1287, Amalgamated Assn. of St. Elec. Ry. & Motor Coach Employees of America* v. *Missouri,* 374 U. S. 74, 82. Although the term "free collective bargaining" does not appear in the National Labor Relations Act, it is found in the legislative history. Sen. Rep. No. 105, 80th Cong., 1st Sess. 2, 13 (1947) ; 93 Cong. Rec. 3835 (1947) (remarks of Senator Taft). The courts have assumed it is basic to the Federal labor laws. See *National Labor Relations Bd.* v. *American Natl. Ins. Co.* 343 U. S. 395, 401–403.

Although G. L. c. 175, § 187F, is presumably directed at some evil not related to labor-management relations, it is plain that the statute has a profound effect upon the collective bargaining between Hancock and the agents' union. The effect of it is to reinforce the power of the strike weapon in the hands of the agents of the petitioner. The normal incident of a strike, namely, the deprivation to the employer of the services of the striking workers, is present.

Under the aegis of G. L. c. 175, § 187F, however, if the agents call a strike, they not only deprive the petitioner of their services, but they also deprive it of its right to enforce provisions for the prepayment of premiums as a condition precedent to insurance coverage under policies on which the premiums "are normally collected by insurance agents employed by the insurer." This latter deprivation occurs not only throughout the strike but for thirty-one days after the "authorized termination" of the strike.

The effect on the petitioner of this premium moratorium is severe. See *New York Life Ins. Co.* v. *Statham*, 93 U. S. 24, 30–31. The premiums paid and the income from the investment of them are the sources from which covered losses, cash surrender values, and loan and nonforfeiture benefits are paid. The petitioner, if deprived of current income, might be forced to liquidate some investments in order to pay these obligations to those claiming them. Further, during the period of the premium moratorium, the petitioner would be in doubt as to who, among those who were insurants at the commencement of the strike, remained insurants throughout the strike. It does not appear that the petitioner could enforce the collection of premium arrearages from those who upon demand after the moratorium claimed that their intention was to let their policies lapse during the moratorium. Presumably those terminating their insurance by nonpayment of arrearages would only be those who had neither suffered losses nor become increased risks during the strike, resulting in a process of self-selection, predicated upon the insurant's self-interest (see *New York Life Ins. Co.* v. *Statham*, 93 U. S. 24, 32), which would be adverse to the petitioner's contractual rights, and in contravention of sound actuarial principles upon which the insurance business is required by law to be conducted. G. L. c. 175, § 9. See *Reynolds* v. *Royal Arcanum*, 192 Mass. 150, 153; *Delaney* v. *Ancient Order of United Workmen*, 244 Mass. 556, 562; *Commissioner of Int. Rev.* v. *Monarch Life Ins. Co.* 114 F. 2d 314, 319 (1st Cir.). Even if the insurer could provide for a right to collect the

arrearages, collection costs which might be substantial would be involved. Under the system of prepayment of premiums basic to the insurance business, such costs are not incurred. According to the statement of agreed facts these anticipated adverse effects of premium moratorium legislation such as G. L. c. 175, § 187F, upon the business of insurance have recently led the National Association of Insurance Commissioners, comprising all the officials charged by law with supervising the business of insurance in each State, territory and insular possession of the United States, to adopt a resolution in opposition to such legislation declaring it "clearly contrary to the existing body of state insurance laws designed to protect the interests of policyholders and to protect the solvency of insurance companies. . . ." 1964 Proceedings of the National Association of Insurance Commissioners, Vol. 1, pp. 40, 157–160, and 210.*

The mentioned prospective losses to the petitioner are inescapably contrary to the actuarial basis upon which the business of insurance is operated because they cannot be definitely provided for through adjusted premiums (and, for life and disability policies, the petitioner has no right to change the premiums on policies already issued). The occurrence of a strike is not an event which can be predicted on statistical data reflecting actual past experience. Rather a strike is an event whose timing is exclusively and whose duration is, for the most part, within the control of the membership of the bargaining unit of the petitioner's agents. Thus the legislation gives the agents' union the power to inflict serious economic loss upon the petitioner, and in so doing provides additional coercive strength to the agents' representatives at the bargaining table.

We think that G. L. c. 175, § 187F, having the above described effects, conflicts with the congressional intent that the parties, subject to a standard of good faith, "should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences." *National Labor Relations Bd.* v. *Insur-*

*ance Agents' Intl. Union, AFL–CIO,* 361 U. S. 477, 488.
The legislation under consideration, while it does not regulate any substantive term of a labor-management agreement (cf. *Local 24, Intl. Brhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL–CIO* v. *Oliver,* 358 U. S. 283), gives the union a potent weapon which cannot fail unilaterally to restrict the desired bilateral freedom of collective bargaining, left free by Congress for the operation of economic forces. For the State to intrude into such an area designed to be kept free is as much a violation of the Federal policy as it is for a State to attempt to regulate rights or duties specifically protected by the Federal acts. *Garner* v. *Teamsters, Chauffeurs & Helpers Union No. 776 (A. F. L.)* 346 U. S. 485, 499–500.

In *General Elec. Co.* v. *Callahan,* 294 F. 2d 60 (1st Cir.) (cert. den. sub nom. *Callahan* v. *General Elec. Co.* 369 U. S. 832), the court dealt with G. L. c. 150, § 3, which, in substance, required the State board of conciliation and arbitration to ascertain which of the parties to the dispute was mainly responsible or blameworthy for its existence or continuance and to publish a report finding the cause and assigning the blame. It was held that the provision was "quite contrary to the national policy not to compel agreement but instead only to encourage voluntary agreements freely arrived at after 'good faith' bargaining between the parties. The conflict between state and federal policy is obvious." *Id.* at p. 67. We think that G. L. c. 175, § 187F, tips the balance in favor of the agents in any labor dispute which may be had with the petitioner. This, with its tendency to compel submission by the petitioner, is repugnant to the national policy favoring agreements arrived at in open and free collective bargaining.

In addition to the general interference with free collective bargaining, G. L. c. 175, § 187F, interferes with rights specifically protected under the National Labor Relations Act, as amended. "Employees shall have the right . . . to refrain from any or all of such [concerted] activities . . .." 61 Stat. 140 (1947), 29 U. S. C. § 157 (1958). Thus

an employee may refrain from participating in a strike, and his right to work during the strike may not be interfered with. 61 Stat. 140 (1947), 29 U. S. C. § 158 (a) (1) (1958). 61 Stat. 141 (1947), 29 U. S. C. § 158 (b) (1) (A) (1958). *International Union, United Auto. Aircraft & Agricultural Implement Wkrs. of America (UAW-CIO)* v. *Russell,* 356 U. S. 634, 655 (dissenting opinion). *National Labor Relations Bd.* v. *Bell Aircraft Corp.* 206 F. 2d 235, 237 (2d Cir.). *Allen-Bradley Co.* v. *National Labor Relations Bd.* 286 F. 2d 442, 445 (7th Cir.). An employer, guilty of no act denounced by the National Labor Relations Act, has the right to protect and continue his business through the hiring or replacements for strikers. *National Labor Relations Bd.* v. *Mackay Radio & Tel. Co.* 304 U. S. 333, 345. See *National Labor Relations Bd.* v. *Erie Resistor Corp.* 373 U. S. 221, 233. General Laws c. 175, § 187F, by suspending the obligation upon policyholders to pay premiums, in our opinion has the effect of sharply curtailing or eliminating the premium collection work available for the nonstriking workers or the replacements. Thus the right of the worker to refrain from participating in any strike and the right of the petitioner to replace workers who have struck are rendered nugatory. We recognize that this direct interference with protected rights is only to the extent that the duties of the petitioner's debit agents consist of the collection of premiums. To what extent their duties are other than the collection of premiums does not appear on this record.

In the light of the foregoing considerations it is our view that G. L. c. 175, § 187F, cannot stand. The harm sought to be averted by this exercise of the police power does not clearly appear.[5] Even if there were a showing of signif-

[5] There is no relevant statutory history. In the last twenty years there have been three strikes in the insurance industry in this Commonwealth. The first was by 93 workers employed by the Prudential Insurance Company of America commencing on January 9, 1951, and lasted one day. The second was by 367 workers employed by the same company and lasted from December 3, 1951, to February 15, 1952. The third was by 280 workers employed by Boston Mutual Life Insurance Company and lasted from February 11, 1955, to May 15, 1955.*

icant State concern which prompted the legislation, however, it would be unavailing to save the statute in view of its inherent incompatibility with Federal labor laws. *Hill* v. *Florida,* 325 U. S. 538, 542–543. *Amalgamated Assn. of St. Elec. Ry. & Motor Coach Employees of America, Div. 998* v. *Wisconsin Employment Relations Bd.* 340 U. S. 383, 398–399. *Local 24, Intl. Brhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL–CIO* v. *Oliver,* 358 U. S. 283, 295–297. *Division 1287, Amalgamated Assn. of St. Elec. Ry. & Motor Coach Employees of America* v. *Missouri,* 374 U. S. 74, 82.

It is unnecessary to discuss the other grounds upon which the petitioner bases its contention that the statute is invalid.

A decree is to be entered in the county court that G. L. c. 175, § 187F, is invalid as applied to the petitioner and that the endorsement form filed by the petitioner with the commissioner on April 13, 1964, is in conformity with the laws of the Commonwealth.

*So ordered.*