ITT LAMP DIVISION of the INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Plaintiff, Appellant,

v.

Stephen A. MINTER, Commissioner of the Massachusetts Department of Public Welfare, Defendant, Appellee.

MAURICE CONCRETE PRODUCTS, INC., Plaintiff, Appellant,

v.

Stephen A. MINTER, Commissioner of the Massachusetts Department of Public Welfare, Defendant, Appellee.

Nos. 7720, 7749.

United States Court of Appeals, First Circuit.

Dec. 14, 1970.

See also D.C., 318 F.Supp. 364.

Jerome H. Somers, Boston, Mass., with whom Louis Chandler, Stoneman & Chandler, Boston, Mass., Matthew E. Murray, Andrew M. Kramer, and Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., were on the brief, for appellants.

William E. Searson, III, Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., was on the brief, for appellee.

Before ALDRICH, Chief Judge, McENTREE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

These two cases,[1] combined for purposes of appeal, present the question whether the defendant Commissioner of the Massachusetts Department of Public Welfare is wrongfully intruding in a labor dispute by making available welfare benefits to strikers who otherwise qualify under Massachusetts statutes providing for General Welfare and Aid to Families with Dependent Children, Mass.G.L. cc. 117 and 118. Plain-

---

1. Brought separately by the ITT Lamp Division of the International Telephone and Telegraph Corporation and Maurice Concrete Products, Inc.

tiffs claim that such state action alters the relative economic strength of the parties, thus entering a field preempted by the national policy guaranteeing free collective bargaining, in violation of the Supremacy Clause of the Constitution. Plaintiffs' motions for injunctive relief were denied, the district court finding no evidence of irreparable injury and no reasonable probability of success on the merits.[2] Although the strike against ITT was subsequently settled, the issue, we know from our own experience, has earlier vainly sought appellate review in this circuit and is likely again to be raised, bringing it close to the "recurring question" category, where significant public rights are involved and court review ought not, if possible, be avoided. *See* So. Pac. Terminal Co. v. I.C.C., 219 U.S. 498, 515–516, 31 S.Ct. 279, 55 L.Ed. 310 (1911) and Marchand v. Director, U. S. Probation Office, 421 F.2d 331 (1st Cir.1970). In any event, however, the appeal of Maurice Concrete presents the identical question.

Plaintiffs have not contended in their brief that the district court erred in finding that there was "no evidence to show to what extent the receipt of welfare payments will affect the continuation of the strike" but have based their claim of irreparable injury on the alleged interference with collective bargaining constituted by the present and prospective payments of welfare benefits.[3] Since at least one of the appeals presents a case where a substantial number of strikers might possibly have qualified for welfare, we prefer to ac-cept plaintiffs' assumption that the issue of irreparable harm merges into and becomes indistinguishable from the issue of probable success on the merits. That is to say that if indeed it is probable that the present and prospective provision of welfare to indigent strikers would be held to frustrate the collective bargaining process, it is equally probable that irreparable injury would be suffered.

We therefore move to the question whether plaintiffs have demonstrated sufficient probability of prevailing on the merits. Automatic Radio Mfg. Co. v. Ford Motor Co., 390 F.2d 113, 115–116 (1st Cir.), cert. denied, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968). So far as our research indicates, this is the first occasion on which a federal court has considered a confrontation between the national policy of free collective bargaining and the administration of a state's welfare laws. For nearly four decades the preemptive sweep of this national policy has, from Allen-Bradley Local 1111, UEW v. Wisconsin Emp. Rel. Bd., 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942) to Local 100, United Association of Journeymen & Apprentices v. Borden, 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638 (1963), been interpreted by the Supreme Court in the context of real or potential conflict between federal and state tribunals in deciding issues arising out of activities protected or proscribed by sections 7 and 8 of the National Labor Relations Act, 29 U.S.C. §§ 157; 158,[4] with occasional favorable consideration bestowed

---

2. The action of the court, though in response to a motion for temporary restraining order, was taken after a full presentation by both parties, Austin v. Altman, 332 F.2d 273, 275 (2d Cir. 1964), and had the effect of a denial of an injunction, *see* United States v. Cities Service Co., 410 F.2d 662, 663 n. 1 (1st Cir. 1969), and is therefore appealable.

3. If plaintiffs' approach is not correct, they, in any case, have surely not established irreparable injury. Our record is almost bereft of any indication of significant impact on either plaintiff. In the ITT case, apparently 175 or about 25%

of 660 striking employees had applied for welfare. In the Maurice Concrete case we have only the contrary assertions of counsel at argument that (1) a majority of 25 workers were receiving welfare and (2) only one worker was on welfare, and he because he was hit by a truck. There is no evidence of any relationship between the availability of welfare benefits to present or prospective striker recipients and the likelihood of prolongation of either strike.

4. Of the same genus was our own case, General Electric Co. v. Callahan, 294 F.2d 60 (1st Cir. 1961), appeal dis-

on state law invoked to prevent or compensate for acts of violence [5] or for verbal excesses.[6] All of the commentaries that have come to our attention have carried on the labor policy preemption debate in terms of these lines of cases with no mention of the problem posed by these appeals.[7] While we do not know how long the challenged application of the Massachusetts Welfare Laws has existed, we know that New York has so administered its laws for eighteen years, Lascaris v. Wyman, 61 Misc.2d 212, 305 N.Y.S.2d 212, 216 (1969), and Illinois for twenty years, Strat-O-Seal Mfg. Co. v. Scott, 72 Ill.App.2d 480, 218 N.E.2d 227 (1966). This vacuum of case and comment on the issue at hand, while perhaps to be explained by the mooting of cases by strike settlements before the issue is reached, makes us pause before declaring probable the preemptive bar of federal labor policy as applied to the historic state preserve of welfare.

The very novelty of the issue posed by the appeals places it outside of the focus of San Diego Building Trades v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed. 2d 775 (1958), its ancestors and progeny. For Garmon, a deliberate effort by the Court to clarify standards relating to preemption in the labor-management field, was concerned with the specific subject matter of sections 7 and 8 of the National Labor Relations Act, 29 U.S.C. §§ 157, 158—the protection of concerted activities and the proscription of unfair labor practices—both responsibilities having been vested in a single tribunal,

the National Labor Relations Board. The bar against state action in *Garmon*, therefore, covers state regulation of conduct or activities which are clearly or arguably "within the compass" of sections 7 and 8 and therefore within the sole jurisdiction of the Board. *Garmon*, *supra* at 245, 79 S.Ct. 773. The administration of state welfare programs so as to render eligible individual strikers who otherwise qualify does not even arguably fall within the zone delineated in *Garmon*.

█ What we therefore confront is the question of applying the Supremacy Clause to a non-*Garmon* situation, where the asserted conflict is not an invasion by the state into an area of conduct regulated by a national instrumentality but a tangential frustration of the national policy objective of unfettered collective bargaining by state economic sustenance of some of the individuals who participate in federally protected, concerted activity. In such a situation, a balancing process seems called for under the general approach to preemption followed by the Supreme Court, in which both the degree of conflict and the relative importance of the federal and state interests are assessed. Note, Federal Preemption: Governmental Interests and the Role of the Supreme Court, Duke L.J. 484, 510, 511 (1966). Where Congress has not clearly manifested its purpose to exclude state action which takes the form of exercise of its historic police powers, such state action will not be invalidated under the Supremacy

missed, 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962), in which state legislation authorized a state tribunal to investigate a labor dispute and publicly report its findings as to the blameworthiness of the parties.

5. United Construction Workers v. Laburnum, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954); International Union, UAW v. Russell, 356 U.S. 634, 78 S.Ct. 932, 2 L.Ed.2d 1030 (1958).

6. Linn v. United Plant Guard Workers Local 114, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

7. *See, e. g.*, Labor Decisions of the Supreme Court at the October Term, 1957, 44 Va.L.Rev. 1057 (1958); Wellington, Labor and the Federal System, 26 U. of Chic.L.Rev. 542 (1959); Michelman, State Power to Govern Concerted Employee Activities, 74 Harv.L.Rev. 641 (1962); Meltzer, The Supreme Court, Congress and State Jurisdiction over Labor Relations, 59 Col.L.Rev. 6 (1959); Note, Preemption of State Labor Regulations Collaterally in Conflict with the National Labor Relations Act, 37 Geo. Wash.L.Rev. 132 (1968); Note, Federal Preemption in Labor Relations, 63 Northwestern L.Rev. 128 (1968).

Clause, "in the absence of persuasive reasons", Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or unless the administration of the state law "palpably infringes" upon the federal policy. Southern Pac. Co. v. Arizona ex rel. Sullivan, 325 U.S. 761, 766, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945). *See also* Head v. New Mexico Bd. of Examiners, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963); Buck v. California, 343 U.S. 99, 72 S.Ct. 502, 96 L.Ed. 775 (1952).[8]

On neither count—the issue of extent of conflict or the relative strength of the federal and state interests—would we feel confident in any *a priori* judgment. A court would first have to determine the quantum of impact on collective bargaining stemming from the granting of welfare benefits to strikers. If this is found substantial a court would then have to weigh the impact on the state of declaring needy strikers and their families ineligible for welfare against the extent to which making them eligible stripped state government of its neutrality in a labor-management dispute.

Such weighing exercises could not be restricted to an ad hoc exploration of the microcosm of these particular disputes. A court must deal with "classes of situations" and not "judgments on the impact of * * * particular conflicts on the entire scheme of federal labor policy and administration", *Garmon, supra,* 359 U.S. at 242, 79 S.Ct. at 778. Under such an approach, a court would be interested in how many states permit strikers to receive welfare; whether or not strikes tend to be of longer duration where welfare is received; any studies or expert testimony evaluating the impact of eligibility for benefits on the strikers' resolve; a comparison between strike benefits and welfare benefits; the impact of the requirement that welfare recipients accept suitable employment; how many strikers actually do receive welfare benefits; and a host of other factors. In addition, the state's legitimate interests must also be considered: its interests in minimizing hardship to families of strikers who have no other resources than the weekly pay check, its concern in avoiding conditions that could lead to violence, its interest in forestalling economic stagnation in local communities, etc.[9]

This very catalogue of data relevant to a macrocosmic weighing, which a court, if called upon would have to un-

8. *Garmon* itself applies, within its area, the general approach, recognizing that on any issue of arguable conflict with sections 7 and 8, state action would nevertheless be tolerated where "the activity regulated [is] a merely peripheral concern of the Labor Management Relations Act", 359 U.S. at 243, 79 S.Ct. at 779 "[o]r where the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." 359 U.S. at 244, 79 S.Ct. at 779.

9. We note that there may arise non-*Garmon* labor relations situations where the conflict between federal and state interests and their relative importance would be so clear as to render such an extended empirical exploration unnecessary. The Massachusetts Supreme Judicial Court considered such to be the case in John Hancock Life Ins. Co. v. Com'r of Insurance, 349 Mass. 390, 208 N.E.2d 516 (1965). In that decision the court invalidated a state statute protecting insurance policy holders by declaring a moratorium on the obligation to prepay premiums during a strike and a 31-day period following its termination. The court found, on the one hand, that this law "tips the balance in favor of the [striking] agents in any labor dispute" with an insurance company, 349 Mass. at 403, 208 N.E.2d at 525, by depriving the employer of assets and actuarial data vital to its business, and by effectively frustrating the employer's right to replace workers who have struck. Moreover, the statute denies to nonstriking agents their right to refrain from concerted activities. On the other hand, the court noted that the "harm sought to be averted by this exercise of the police power does not clearly appear." 349 Mass. at 404, 208 N.E.2d at 525.

dertake, indicates the preferable forum to be the Congress. Congress would be particularly appropriate in resolving this issue. The activity allegedly intruding into federal labor policy is not solely a state activity but rather a joint state-federal program. Congress has established the minimal requirements with which participating state welfare plans must comply. 42 U.S.C. § 602, et seq. We do not attribute heavy weight to Congressional silence, but we would doubt that, if striker eligibility for welfare had a significant impact on labor-management relations, Congress would be unaware of that impact. Moreover, if the issue proves to be finely balanced, after weighing all the evidence, it may be a sufficient justification for upholding the state action that Congress is always free to provide specifically for preemption. See Penn Dairies v. Milk Control Comm., 318 U.S. 261, 275, 63 S. Ct. 617, 87 L.Ed. 748 (1943).

▣ In sum, wholly apart from the inadequacy of the evidence before the district court, we have substantial doubt that a significant frustration of federal collective bargaining policy is effected by the granting of welfare benefits to indigent strikers or that, even so, the state interest is so insubstantial compared to the federal interest that Congress must be supposed to have deprived the state of such power to serve that interest. We accordingly hold that the district court did not err in concluding that plaintiffs' case did not have a sufficient probability of prevailing on the merits.

▣ There remains for our consideration plaintiffs' contention that the granting of welfare benefits to strikers violates the provisions of the Massachusetts Welfare Statutes and its federal counterpart, in that strikers, having voluntarily left their jobs, are persons who have "without good cause * * * refused a bona fide offer of employment. * * *" 42 U.S.C. § 607(b) (1).[10] Plaintiffs tend in their argument to assume the very point in issue by equating a refusal to work with "fault" and absence of "good cause". But this is no less circular or more persuasive than the contrary assumption of the defendant, accepted by the district court, that exercising one's federally protected right to strike constitutes "good cause" to refuse employment.[11] And the federal scheme, as plaintiffs' reference to the Senate Finance Committee's Report makes clear, allows the state, without of course deciding the merits of a particular controversy, to make the determination of what is covered by "good cause", and what constitutes a "bona fide" offer of employment. Senate Committee on Finance, Rep.No. 165, 87th Cong., 1st Sess. p. 3 (1961), U.S.Code Cong. & Admin.News, pp. 1716, 1718.

The fact that the Massachusetts legislature has specifically made unemployment compensation unavailable to workers on strike, Mass.G.L. c. 151A, § 25, does not cast doubt on the Commissioner's determination. We observe first that welfare programs, supplying unmet subsistence needs to families without time limitation, address a more basic social need than does unemployment compensation, which attempts to cushion the shock of seasonal, cyclical, or technological unemployment by making available time limited benefits to individual workers, varying in relation to their prior earnings and without reference to dem-

10. The complementary Massachusetts statute likewise renders a person ineligible if he "willfully fails without good cause, as determined by the [welfare] department, to maintain his registration for work * * * or to accept a referral to or offer of suitable employment", Mass.G.L. c. 117, § 1B.

11. The middle ground, qualifying for welfare on a case-by-case basis only those strikers who are engaged in a "reasonable" strike, is almost unthinkable, necessarily requiring the Commissioner of Welfare to take sides in every labor dispute, an activity which we held impermissible in General Electric Co. v. Callahan, 294 F.2d 60 (1st Cir. 1961), appeal dismissed, 369 U.S. 832, 82 S.Ct. 851, 7 L.Ed.2d 840 (1962).

onstrated need. Secondly, we would not lightly expand the legislature's expressed negative in one piece of legislation to constitute an unexpressed proviso in another. Indeed silence on an issue where a legislature has shown its capacity to speak is all the more significant.

Plaintiffs' further reference to the legislative history behind the federal enactment is not particularly helpful. The passages they quote do support the proposition, which the court accepts, that welfare programs were not designed to aid those who do not seek employment. But strikers who receive benefits fully conform to this legislative intention, since, as we noted above, all recipients, strikers included, must register and accept available alternate work under Mass.G.L. c. 117, § 1B. Furthermore, the legislative history neither states, nor can be read to imply that strikers, as a group, are to be held ineligible for welfare benefits if they meet all qualifications set by the state.

In sum, therefore, we cannot say, as a matter of probability, that the Commissioner's administrative determination of striker eligibility for welfare is precluded by the relevant state or federal statutes.

Affirmed.