FARMINGTON DOWEL PRODUCTS CO., INC.
*vs.*
FORSTER MANUFACTURING CO., INC.

Franklin.   Opinion, November 21, 1957.

*Berman, Berman & Wernick,*
*John J. Flaherty,* for plaintiff.

*Locke, Campbell, Reid & Hebert,* for defendant.

SITTING: WILLIAMSON, C. J., WEBBER, BELIVEAU, TAPLEY, SULLIVAN, DUBORD, JJ.

WEBBER, J.   This case involves a construction of the statute entitled "Unfair Sales Act," R. S. 1954, Chap. 184. Plaintiff here has brought an action at law seeking treble damages resulting from alleged advertising, offers to sell, and sales below cost with intent to injure competitors, including the plaintiff, and to destroy competition. The defendant is a manufacturer and producer alleged to be selling its product at wholesale and retail. By special demurrer the defendant raises several legal issues, perhaps the most important of which is the vital question as to whether the statute under consideration has application to manufacturers and producers.

We have had only one previous occasion to examine this statute. In *Wiley* v. *Sampson-Ripley Co.,* 151 Me. 400, we held that the provision therein that proof of sales below cost constitutes prima facie evidence of an intent to injure competitors and destroy competition was unconstitutional. By dictum we indicated our acceptance of the legal principle that legislative prohibition of sales below cost made with proven intent to injure competitors or destroy competition was within the police power. That opinion, however, has not of course in any way diminished our obligation to scrutinize each set of facts as presented and determine whether or not the statute is in other respects constitutional as applied to those facts.

This statute, being in derogation of the common law, must be strictly construed. *Wiley* v. *Sampson-Ripley Co., supra.* In *Loughran Co.* v. *Lord Baltimore Candy & T. Co.* (1940), 178 Md. 38, 12 A. (2nd) 201, 204, the court said: "In other words, we are not to infer that the Legislature intended to change common law principles beyond what is clearly expressed by the statute." Conduct which was lawful at com-

mon law is by the statute made wrongful. The statute has newly created what may be termed a business crime. The offending merchant may find himself faced with either criminal prosecution, the threat of injunction, or an action at law for damages. In either case he is entitled to be informed by the statute in explicit and unambiguous language what acts and conduct are prohibited.

Many states have taken legislative action to prevent so-called "unfair sales." Courts which have construed these enactments have generally agreed that two essential factors must be shown to coexist, the wrongful intent and the sales below cost. (For the sake of simplicity we refer to sales rather than to advertising or offers to sell.) Absent either factor, the prosecution for violation must fail. Since from the earliest days of trade, merchants, whether starting a new enterprise or engaging in an established business, have entertained the not unnatural inclination to attract as many customers as possible away from their competitors, it must be expected that the intent to injure competitors will often be present. So long as the intent is not implemented by the unlawful act, however, the statute may not be invoked. The merchant who seeks by "building the better mousetrap" or by some lawful competitive inducement to corner the market for himself, but without resort to any conduct prohibited by law, may possess the requisite intent to injure or destroy competition and yet not be in violation of the statute. In short, proof of either of the essential factors without proof of the other will not suffice. Thus the public is assured of the lowest prices which can be produced by fair and lawful competition. It becomes apparent, therefore, that it is most important that the language of the statute inform the business man of ordinary intelligence whether his particular business operations are covered by the statute, and if so, what conduct on his part is specifically prohibited. If the statute is so vague and uncertain with respect to these matters as to leave him to guess as to its

application, it is unenforceable as to him. This basic rule applies alike to criminal prosecution and injunctive relief. As was stated in *Loughran Co.* v. *Lord Baltimore C. & T. Co., supra*, at page 205: "The right of injunctive remedy and the application of penal statutes should not be susceptible of doubt or conjecture.[1]"

We note at the outset that the Maine statute contains language unlike that found in the statutes of other states. In a majority of the states, the statutes are made applicable only to those who are engaged in the distributive trades. A relatively small group of states have extended the restrictions against "unfair sales" to producers and manufacturers. Quite significantly, we think, those statutes which are recognized as applying to producers and manufacturers include a definition of production cost. The definition found in the California law (Ann. Cal. Code, Sec. 17026) is reasonably representative. The term "cost" as applied to production is defined as including the cost of raw materials, labor and all overhead expenses of the producer; and as applied to distribution "cost" means the invoice or replacement cost, whichever is lower, of the article or product to the distributor and vendor plus the cost of doing business by said distributor or vendor. It is apparent that students of the subject have regarded Maine as one of the states regulating only the distributive trades. In 1948 an article in 57 Yale Law Journal 391 at 412 contained the following: "Nine of the statutes[2], not confining themselves to distributive trades, deal also with producers and define their costs as 'the costs of raw materials, labor and all overhead

---

[1] As a result of the Loughran case, the Maryland Act relating to "unfair sales" was re-drafted in 1941 and all the features noted by Loughran as objectionable, some of which appear in the Maine statute, were removed. In its new form the Maryland law was approved in *Blum* v. *Engleman* (1948), 190 Md. 109, 57 A. (2nd) 421.

[2] Callmann, Unfair Competition and Trade Marks, 2d Ed. (1950) page 537, lists ten states which define production cost. They are Arkansas, California, Colorado, Kentucky, Montana, Oregon, Utah, Washington, Wyoming and South Carolina.

expenses.' The remainder refer only to costs of wholesalers and retailers, and state the minimum level to be invoice cost plus the 'cost of doing business.' " In a footnote the author includes Maine as one of the states falling into the latter group (page 413). Were these writers justified in assuming as they apparently did that the Maine law is intended to apply only to the distributive trades, and not to producers and manufacturers? What does the statute say?

Sec. 1, Subsections I and II define "cost to the retailer" and "cost to the wholesaler." It is true of course that every producer and manufacturer must sell his product. This he does usually at wholesale and less commonly at retail. In this limited sense a manufacturer is a wholesaler or a retailer. But in ordinary and accepted business parlance the terms have distinct meaning and do not overlap. In the business world the producer or manufacturer is considered to be one who makes or assembles the merchandise he sells. The wholesaler and retailer are thought of as buying merchandise for resale, the essential distinction between them being ordinarily in the relative quantities purchased and sold. We do not think that the terms "wholesaler" and "retailer," without more, would be understood by business men of ordinary intelligence and possessed of reasonable familiarity with the common and accepted meaning of the terms as having any application to producers or manufacturers. Moreover, the cost definition only serves to support the assumption that only the distributive trades are affected. The "cost to the retailer" is defined as "the invoice cost of the merchandise to the retailer within 30 days prior to the date of sale, or the replacement cost of the merchandise to the retailer within 30 days prior to the date of sale, in the quantity last purchased, whichever is the lower." (To this is added freight, cartage and the cost of doing business as defined.) For purposes of this discussion, the "cost to the wholesaler" is essentially the same. We note at the outset that these cost definitions are in every material

respect similar to those employed in the statutes of other states which seek to regulate *only the distributive trades*. The term "invoice cost" would be understood in the business world to import a purchase of the very merchandise now being sold. It is a term ordinarily employed to designate the cost of merchandise bought in the ordinary channels of trade. It would be inconceivable, we think, that the term would be understood to embrace the cost of raw materials and labor, the two primary costs of manufacture. Surely there is no "invoice cost" of labor in any recognized sense. Our view is further strengthened when we turn to the alternative "replacement cost." For here the phrase is added, "in the quantity last purchased." Here is a clear indication that the Legislature, in defining cost, contemplated a "purchase" of the very goods now being sold. This phrase can in our judgment only relate to the distributive trades.

We note with interest that in 1953 the Legislature amended the Act by adding to Subsection II of Sec. 1 thereof a new paragraph numbered D which reads:

> "D. Sales made by a cigaret *distributor* to a licensed *wholesale dealer* or to the operator of 15 or more vending machines shall not be subject to a markup of 2% as stated in the provisions of the preceding paragraph, but such sales shall be subject to full trade discount only." (Emphasis supplied) (P. L. 1953, Chap. 308, Sec. 112)

This new paragraph was incorporated into the section dealing with the "cost to the wholesaler." Rather significantly the word "distributor" was used. We would be reluctant, in the absence of concise and specific language, to conclude that the Legislature intended its definition of "cost to the wholesaler" to apply to producers and manufacturers or all other products if sold by them at wholesale, but only to distributors of cigarets. We think it more reasonable to conclude that only persons engaged in the distributive

trades were contemplated, whether of cigarets or other merchandise. Moreover, the term "wholesale dealer" appears in the context in such a manner as to exclude the possibility that it was meant to include manufacturers and producers of cigarets. Rather it is suggested that the term as used has a well understood connotation which does not embrace manufacturers and producers and is synonymous with the word "wholesaler" used elsewhere in the statute.

Subsection VI defines "retailer" as follows: "The term 'retailer' shall mean and include every person, co-partnership, corporation or association engaged in the business of making sales at retail within this state; provided that in the case of a retailer engaged in the business of making sales both at retail and at wholesale, such term shall be applied only to the retail portion of such business." Is a producer or a manufacturer engaged *in the business of* making sales at retail within the meaning of the statute? We think not. His business is manufacturing and his sales are in aid of and incidental to that operation. On the contrary, one who buys at wholesale and sells in smaller quantity at retail is obviously in the business, the primary business if you will, of making retail sales. A similar distinction was noted in *J. H. Allison & Co.* v. *Killough et al.* (1927), (Tenn.) 300 S. W. 5. The result is the same when we consider the definition of "wholesaler" found in Subsection VII.

There is but one phrase in the entire Act which suggests that it was intended to apply to producers and manufacturers as well as to the distributive trades. In Sec. 1, Subsec. VIII we find the following:

> "VIII. Where a retailer sells at retail any merchandise *which is the product of his or its own manufacture* or which has been purchased by him or it at the purchase price or prices available to wholesalers, in the absence of proof of a lesser cost, both the wholesale markup of 2% and the retail markup of 6% to cover in part the cost of do-

> ing business, as provided in subsections I and II, shall be added in determining the 'cost to the retailer' of such merchandise." (Emphasis supplied)

Plaintiff sees in the italicized phrase a clear indication that the Act as a whole is intended to regulate producers and manufacturers. We are not persuaded that this is necessarily so. So construed, the statute remains obscure. The markups referred to are to be added, but to what? If to the "cost to the wholesaler" defined in Subsec. II, that "cost" is meaningless as we have already indicated when applied to a producer or manufacturer. If we were compelled to hold that the Act applies to producers and manufacturers, we would feel equally compelled to hold that the cost definition is too vague, uncertain and conjectural when so applied to satisfy the constitutional requirements of due process of law. We prefer to give to the statute that meaning which we think from a reading of the whole Act it was intended to have, and which will obviate the necessity of passing on the constitutional question. In so saying, we follow a well recognized rule of construction. *State* v. *Intoxicating Liquors*, 80 Me. 57, 62; *Hamilton* v. *District*, 120 Me. 15, 20. In *Rust* v. *Griggs* (1938), (Tenn.) 113 S. W. (2nd) 733, an "unfair sales" case, the court supplied the word "not" omitted by inadvertence from the statute to save it from being "senseless and ineffective" and "to carry out the plain legislative intent." We conclude that the phrase in Subsec. VIII which we have italicized is meaningless when read in context with the entire Act. We assume the phrase crept into the law by some inadvertence when it was originally drafted. This is more readily understandable when we consider the history of "unfair sales" legislation here and elsewhere. These statutes had their origin during the economic depression which beset our nation during the thirties. No doubt it was hoped that the imposition of a minimum price base might serve to alleviate some of the economic ills of the

moment. State after state enacted "unfair sales" acts in one form or another. Maine followed suit in 1939 (P. L. 1939, Chap. 240). No uniform law has ever been adopted and it is not surprising that in the framing of legislation in a new field, a phrase was inserted which was inconsistent with the manifest intent, purpose and scope of the new law. The Legislative Record indicates that the Act was passed without debate. The issue as to whether the Act was ever intended to apply to producers and manufacturers seems not to have arisen heretofore. The answer must be found within the four corners of the Act itself.

We are not greatly aided by the decisions of other courts. The precise question which confronts us does not appear to have been raised or decided elsewhere. The voluminous and painstaking research of learned counsel has brought to our attention practically every decided case on the subject and we have examined these authorities with interest and attention. We note that in not one of these cases was a manufacturer or a producer involved. All have been concerned with wholesalers and retailers (giving these terms their ordinary and accepted meaning) engaged in the distributive trades.

A line of cases following the lead of *State* v. *Langley* (1938), 53 Wyo. 323, 84 P. (2nd) 767, has determined (1) that legislative control is justifiable where there is present an intent to injure or destroy competition coupled with sales below cost, and (2) that the cost definition spelled out by the statute should be interpreted as meaning only "the approximate cost arrived at by a reasonable rule," or stated otherwise, the cost arrived at by the dealer "in good faith." *Assoc. Merchants of Montana* v. *Ormesher* (1939), 107 Mont. 530, 86 P. (2nd) 1031; *State* v. *Sears* (1940), 4 Wash. (2nd) 200, 103 P. (2nd) 337; *Dikeou* v. *Food Distributors Assn.* (1940), 107 Colo. 38, 108 P. (2nd) 529; *McIntire* v. *Borofsky* (1948), 95 N. H. 174, 59 A. (2nd) 471. On our

view of the case before us, it is not necessary here to decide whether in an appropriate case we would or would not adopt the "good faith" cost rule. Consideration would most certainly have to be given to the possible danger that when two different cost accounting theories are advanced, the preference felt by the factfinder for one theory may too readily lead to a finding of bad faith on the part of a merchant who adopts the other. Although a violation was perhaps clearly shown in *Dikeou* v. *Food Distributors Assn.,* *supra,* the facts would only need to be altered slightly to present the precise issue as to choice of conflicting cost accounting theories. When applied to the problems of manufacture, especially in the allocation of overhead to unit costs, the difficulties would be complex, if not insurmountable.[3] Suffice it to say in disposition of the case at bar that when a statute uses a cost definition which is manifestly applicable only to distributors, that is a sufficient indication that the Act was not designed to apply to manufacturers.

We neither intimate nor suggest what our holding would be as to the constitutionality of certain portions of this Act when applied to a distributor. That would depend upon the particular facts presented. ·

There are other reasons why the declaration here is vulnerable to demurrer, but in view of our holding that this action against a producer and manufacturer has no foundation either at common law or by statute, it is unnecessary to consider them here.

The entry will be

*Exceptions sustained.*

---

[3] 57 Yale Law Journal 391, 394. "For the theory to operate successfully, there must be agreement on what constitutes 'cost'. 'Accounting principles' do not answer this problem; accountants themselves differ widely as to proper methods of valuing assets, of assigning general expenses to particular products and periods, and of computing other elements of cost."