The **PRUDENTIAL INSURANCE COMPANY OF AMERICA**

v.

**INSURANCE COMMISSIONER.**

Supreme Judicial Court of Maine.

July 13, 1972.

Drummond, Wescott & Woodsum by Daniel T. Drummond, Jr., Portland, Hale & Dorr, by Frederick G. Fisher, Jr., Boston, Mass., for plaintiff.

Wathen & Wathen by Warren E. Winslow, Jr., Charles R. Larouche, Asst. Atty. Gen., Augusta, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

WEATHERBEE, Justice.

In 1969 the Legislature enacted P.L.1969, Chap. 374 which has become 24–A M.R.S.A. § 4751 and was added as one additional section to our statutes concerning insurance. The new section 4751, which became effective October 1, 1969, reads:

*"Strikes of insurance agents*

§ 4751. Life, noncancellable health, hospital expense and hospital and surgi-

cal expense insurance contracts; default in payment of premium during strike of insurance agents

1. Default. No contract of life, noncancellable health, hospital expense or hospital and surgical expense, insurance which goes into effect in this State on or after the 30th day after January 2, 1970 shall lapse during any 30-day period immediately following the inception of a strike by reason of any default in the payment of any premium during a strike of insurance agents employed by an insurer authorized to transact business in this State, if

A. The collection of the contract premium was, at commencement of the strike, a duty, charge or obligation of any of such agents, according to the records, books, instructions, practice or organization of the insurer, and

B. Such agents are represented for purposes of collective bargaining by a labor organization which has been so recognized or certified or has been a party to any collective bargaining agreement with the insurer.

2. Definitions. For the purpose of this section:

A. Lapse. 'Lapse' shall mean lapse, be terminated or in any way modified or qualified as to the obligations of the insurer and the right of the insured.

B. Premium. 'Premium' shall mean premium, interest, assessment or any other payment or charge for or in connection with the insurance which would be due to the insurer under the insurance contract during the strike of agents, except for the operation of this section.

C. Strike. 'Strike' shall mean strike or other concerted stoppage of work by employees, including a stoppage by reason of the expiration of a collective bargaining agreement, so long as any of the foregoing is authorized by the labor organization according to the labor organization's own interpretation and application of its applicable internal rules and procedures.

3. Claims. If a claim under any insurance contract covered by this section arises during a 30-day period immediately following the inception of a strike, the insurer may deduct from any amounts payable on account of the claim any premiums which are thus in default.

4. Notice. Within 10 days from the inception of a strike, notice of same containing instructions to make payment of premiums by mail shall be mailed to each affected insured by the insurer."

The Plaintiff is engaged in the business of life insurance and health and accident insurance in Maine, as well as in every other state. It submitted to the Defendant, who is the Insurance Commissioner of the State of Maine, for his review and approval[1] an Endorsement Form for attachment to its policies issued for delivery in the State of Maine on or after February 1, 1970. The Defendant Commissioner disapproved of the proposed Endorsement Form on the ground that it did not comply with section 4751.

Following a hearing which the Plaintiff had requested,[2] the Defendant issued an order affirming his prior refusal.[3] The effect of the order was to prohibit the Plaintiff from using the proposed Form.

The Plaintiff then filed a complaint in the Superior Court of Kennebec County seeking a review of the Defendant's order, a determination that section 4751 is unconstitutional and a ruling that the Plaintiff's proposed Form complies with Maine law.

By stipulation of the parties the action was then reported to this Court on the

1. 24–A M.R.S.A. § 413(1).

2. 24–A M.R.S.A. § 231.

3. 24–A M.R.S.A. § 235.

complaint, answer and exhibits. An Agreed Statement of Facts accompanied the Report. Because of the industry-wide interest in the issue, we received briefs from the John Hancock Mutual Life Insurance Company, the Boston Mutual Life Insurance Company, the Life Insurance Association of America and the Insurance Workers International Union, AFL–CIO.

While the proposed Form did not comply with section 4751,[4] the Plaintiff takes the position that section 4751 is unconstitutional and invalid because 1) it is not a proper exercise of the police power and it impinges upon free collective bargaining relationships in an area preempted by the National Labor Relations Act in violation of the Supremacy Clause of the Constitution of the United States and 2) it interferes with Plaintiff's freedom to engage in a lawful business on sound actuarial principles and is so vague and indefinite that it deprives the Plaintiff of liberty and property without due process of law.

In order to fully appreciate the operation of the new section upon the Plaintiff's conduct of its business we must review some of the agreed essential principles underlying the insurance business and the agreed facts as to the Plaintiff's operating situation and practices as of the time of oral argument.

The principle of insurance is the spreading of the consequences of a loss over the entire group whose premium payments, with returns from investments, create a common fund from which losses are paid. The lifeblood of the insurance industry is, of course, the timely payment of premiums.

The amount of the premium charged to each insured is calculated with reference to his life expectancy and class, the benefits promised and the risks covered by his particular policy, the assumed rate of return on the insurer's investments of premium funds and the assumed amount of applicable expenses, all calculated in the light of statistical data reflecting actual past experience and with regard to predictable future experience.

It is an agreed principle of pooling insurance risks that the premium must be paid by the insured in advance of the period for which insurance is provided because of the tendency of some persons who have incurred no loss to deny later that coverage was intended. Advance payment of premiums protects the common fund to make it available for payment of current expenses and benefits without a need to liquidate long-term investments at loss.

Plaintiff must conduct its business in accordance with such principles and the losses which might result from the operation of section 4751 are not calculable with accuracy.

It is agreed that the Plaintiff is engaged and intends to continue to be engaged in issuing individual life, noncancellable health, hospital expense and hospital and surgical expense policies. It is the practice of the Plaintiff that the premiums on a substantial part of these policies are collected by its debit agents at the residences or places of employment of the insureds. The policies themselves contain no commitment by the Plaintiff to make such premium collection service available[5] but the Plaintiff has chosen as a matter of business policy to employ debit agents who make monthly collections on all types of its policies for policyholders who find this

---

4. It provided that a strike of insurance agents employed by the Company would not operate to prevent lapse, extend the grace period or postpone the due date of the premium but that in the event of such a strike, a policy the premium of which is unpaid at the end of the grace period may be reinstated without proof of insurability upon payment of the due premiums and 5% interest within 60 days after due date and during the Insured's lifetime.

5. In fact, all Plaintiff's policies provide in substance that payment of premiums shall be made to the Plaintiff either at Plaintiff's home office or to an agent authorized to receive payment.

method of premium payment convenient. The advantages to the policyholder in this method of payment are that he receives a personal call as a reminder to pay the premium, that he may pay in cash at a place convenient to him and that he may choose to pay smaller sums more frequently than by the premium notice method and thus avoid necessity of responsibility for having to set aside large sums as those paying under the premium notice plan must do.

The failure of a debit agent to collect a premium directly from the insured does not under the terms of the policy relieve the insured of his obligation to pay the premium when due and, except in the case of one type of policy, the insured may change from one premium payment interval to another if he so wishes.

As of June 30, 1969 Plaintiff had 128 debit agents working out of its twelve Maine offices. The Insurance Workers International Union (AFL–CIO) represents all of these debit agents for collective bargaining but only forty of the debit agents are members of the Union.

Except as to those insured who elect to pay their premiums to debit agents, the Plaintiff sends notices of premiums due to holders of its policies and these insureds transmit their premiums by mail or in person to the Plaintiff's offices. From time to time some holders of premium notice policies pay their premiums to debit agent acquaintances and occasionally some holders of debit policies send their premiums by mail or in person to the Plaintiff's offices, and all of these payments are accepted by Plaintiff. At the request of an insured made within two months of issue Plaintiff will change a premium notice policy into the classification of a debit policy and at the request of the holder at any time it is Plaintiff's practice to change a debit policy to a premium notice policy.

The duties of debit agents consist of the collection, conservation and servicing of debit policies and the conservation and servicing of ordinary policies assigned to them, for all of which they are compensated. They also receive commissions on all new policies which they sell. They keep records of the names and current addresses of owners of the debit policies on which they collect and of the amounts collected. Plaintiff keeps no record of current addresses of debit policyholders. A substantial part of the business written by Plaintiff in Maine is in debit policies.

Meager experience with strikes in the insurance industry has yielded little statistical data as to their impact upon holders of debit policies. From 1951 to the time of argument in this case there had been seven strikes or work stoppages involving debit agents in Maine, the largest of which lasted 119 days and the shortest only 1 day.

Against this background, we examine the validity of section 4751 in the light of the Supremacy Clause of the Constitution of the United States, limitations upon the exercise of the police power and guarantees of equal protection and due process.

In our consideration of the validity of section 4751 we have in mind the familiar principle that all acts of the Legislature are presumed to be constitutional, that this is a presumption of great strength and that the burden is on him who claims that the Act is unconstitutional to show its unconstitutionality. State v. The Fantastic Fair, 158 Me. 450, 186 A.2d 352 (1961).

It is clear that the insurance business as carried on by the Plaintiff is "commerce . . . among the several states" as the term is used by Art. I, § 8, third clause of the United States Constitution and is subject to congressional control. By virtue of the Supremacy Clause of the United States Constitution when a state Act conflicts with federal legislation the state Act is invalid. When it enacted the National Labor Relations Act, as amended, the Congress preempted certain sectors of the field of labor relations. In this comprehensive enactment Congress placed the administration and development of labor

law with a centralized agency, the National Labor Relations Board, partly in order to avoid conflicting efforts to deal with labor relations by various state and federal bodies.

The McCarran-Ferguson Act, 15 U.S.C. § 1011–1015 (1958), however, makes clear the intention of Congress that in spite of the interstate character of the insurance industry, the states should retain certain broad powers of regulation.[6] However, the powers of the states to regulate the industry are specifically restricted by the McCarran-Ferguson Act in the field of labor relations:

"Nothing contained in this chapter shall be construed to affect in any manner the application to the business of insurance of the Act of July 5, 1935, as amended, known as the National Labor Relations Act. . . ." 15 U.S.C. § 1014.

The United States Supreme Court, lacking precise congressional guidelines, has imposed the principle of pre-emption upon this area and has undertaken to delimit state and federal authority to avoid conflict in furthering the national labor relations policy.

While refraining from declaring that the National Labor Relations Act pre-empted "all local regulation that touches or concerns in any way the complex interrelationships between employees, employers and unions",[7] the Supreme Court has sought to state a workable rule to distinguish between state and federal jurisdiction. In San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959) the Court said:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law."

*Garmon,* however, explicitly recognized that state jurisdiction remains where the conduct in issue is of "merely peripheral concern" to the National Labor Relations Act or "touches interests . . . deeply rooted in local feeling and responsibility".

The Court had little difficulty in finding that Congress has preempted conflicting state action limiting the right to strike,[8] requiring certain prerequisites to calling a strike,[9] regulating the right of employees to select their own union representatives,[10] and in determining whether a union had wrongfully applied its union security clause to interfere with a member's employment.[11]

---

6. 15 U.S.C. § 1012:
   "(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
   (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . ."

7. Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America et al. v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971).

8. Division 1287 of Amalgamated Ass'n of Street, Electric Railway and Motor Coach Employees of America v. State of Missouri, 374 U.S. 74, 83 S.Ct. 1657, 10 L.Ed. 2d 763 (1963).

9. International Union of United Automobile, Aircraft and Agricultural Implement Workers v. O'Brien, 339 U.S. 454, 70 S.Ct. 781, 94 L.Ed. 978 (1950).

10. Hill v. Florida ex rel. Watson, 325 U.S. 538, 65 S.Ct. 1373, 89 L.Ed.2d 1782 (1945).

11. Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America et al. v. Lockridge, supra.

On the other hand, the Court has upheld state Acts which prohibited collection of dues by a union if one of its officers had been convicted of a felony,[12] and which placed reasonable limitations on picketing.[13] It has found properly within state court jurisdiction a libel action based upon false and defamatory statements made during a union organizing campaign,[14] a tort action based upon threats of violence against non-union workers[15] and a wrongfully expelled union member's action against the union for breach of his membership contract.[16]

The precise issues which we face in this matter appear to remain in what has been described as a "penumbral area [which] can be rendered progressively clear only by the course of litigation". Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955).

We know of only one other instance where a statute has purported to establish a moratorium on payment of debit premiums in the event of a strike of debit agents. In 1963 the Massachusetts Legislature enacted a statute somewhat similar to that before us. The Massachusetts Court found it to be unconstitutionally in conflict with the National Labor Relations Act.[17]

The Massachusetts Act declared that no debit policies shall lapse by reason of non-payment of premiums during the period that the insurer's debit agents are on strike and during an additional period of 31 days following the termination of the strike but that if a claim arises during these periods before the overdue premiums are paid the insurer may deduct such overdue premiums and interest from the amount payable on the claim.

The Massachusetts Court reviewed at length the economic principles necessarily underlying the business of insurance and especially of that of the sale of debit collection policies, many of which we have briefly discussed. The Court found that, as the parties in our case have agreed, all insurance is based on the principles of prepayment of premiums and fair distribution of the risk among members of the insured class and it examined the expected operational effects of the statute upon the financial ability of the Company to meet its obligations to its policyholders and upon free collective bargaining. The Court found that these effects would be severely and unconstitutionally prejudicial to the Company's financial stability. The Court reasoned that a strike of the debit agents would deprive the Company for an indefinite and unlimited period of its right to enforce the provisions for the prepayment of premiums as a condition precedent to insurance coverage in debit policies. This deprivation of substantial current income would endanger the fund from which claims are paid and neither the occurrence or the length of a strike could be predicted on the basis of statistical data. A likely result would be that insureds who had suffered no loss and had not become bad risks would terminate their policies at the end of the moratorium while people in the oppo-

12. DeVeau v. Braisted, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960).

13. Allen-Bradley Local No. 1111, etc. v. Wisconsin Employment Relations Board, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942).

14. Linn v. United Plant Guard Workers of America, Local 114 et al., 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966).

15. United Construction Workers etc. v. Laburnum Construction Corporation, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954).

16. International Association of Machinists v. Gonzales, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958).

17. John Hancock Mutual Life Insurance Company v. Commissioner of Insurance, 349 Mass. 390, 208 N.E.2d 516 (1965). For good discussions of the principles of federal pre-emption and labor relations involved in *John Hancock* see: 7 B.C.Ind. & Com.L.Rev. 377 (1966), 46 B.U.L.Rev. 118 (1966), 41 N.Y.U.L.Rev. 839 (1966).

site categories would remain insured, resulting in a process of self-selection adverse to the Company's contract rights and contrary to the sound actuarial principles upon which the insurance business is required by law to be conducted.

The Massachusetts Court held that their statute was "contrary to the national policy not to compel [labor] agreements but instead only to encourage voluntary agreements freely arrived at after 'good faith' bargaining between the parties". The statute, the Court said, tips the balance in favor of the agents in any labor dispute with the Company. In addition, *Hancock* held that the suspension of the obligation to pay premiums during the duration of the strike plus 31 days would sharply curtail or even eliminate the premium collection work available for nonstriking workers and replacements thus frustrating the National Labor Relations Act's intention to protect the employee's right to work and the employer's right to attempt to continue its business during the strike.

The distinctions between the statute which the Massachusetts Court struck down and our own are at once apparent and make the reasoning of the *Hancock* opinion of limited assistance to us. While the Massachusetts statute provided for an absolute moratorium on payment of debit policy premiums during the *entire indefinite duration* of a strike plus 31 days, our own imposes a moratorium of exactly 30 days. The present Plaintiff's policies already contain provision for a 31-day grace period following the due-date of the premium during which the rights of the policyholder do not lapse. Therefore, the effect upon the Company of the operation of the 30-day moratorium which is imposed by section 4751 would vary with each policy in accordance with the relation between the due-date of each premium and the commencement date of the strike. Section 4751 creates a 30-day moratorium which is not in all instances additional to the 31-day grace period.

For example, if the premium is due January 1 and the strike begins January 2, the 31-day grace period and the 30-day moratorium period would expire simultaneously and the effect of the 30-day moratorium upon the Plaintiff would be nil. On the other hand, if the premium is due January 1 and still unpaid when the strike begins February 1, the Plaintiff would be faced with an additional full 30-day period during which it may not receive payment of the premium and during which the status of the insured as a desirable risk, on the one hand, or the inclination of the insured to pay the overdue premium, on the other, may change to the Plaintiff's detriment.

Certainly our statute imposes upon the Plaintiff the probability that as a result of a strike of the debit agents, an uncertain number of the holders of its debit policies would fail to pay their premiums on the due date or within the 31-day grace period and as a result, the Plaintiff would be deprived of sums of money not accurately predictable for varying periods of time additional to the 31-day grace period. Although the Plaintiff would undoubtedly suffer some detriment, in no case would this extend longer than an additional 30 days.

However, the insurance business is affected with a public interest and the State has a legitimate concern with the interests of holders of contracts of insurance and has long acted under the police power to regulate the industry. To the extent that it does not invade preempted areas it may continue to do so while acting for proper purposes and with reasonable methods although either labor or management suffers an incidental adverse effect.

■ The State may properly concern itself with the interests of policyholders whom the Company has permitted to expect the collection of their premiums to be made by debit agents in spite of the provisions of the insurance contracts. It appears not unreasonable for the Legislature to conclude that public policy necessitates

that these insureds be guarded against the lapsing of their insurance contracts and the loss of their rights as a result of strikes by their debit collectors, the occurrence or significance of which may not have come to their attention in time for them to make other arrangements for payment of their premiums. Some unfavorable effect upon the Company may be expected to result from the loss of some prepayment of premiums during these varying periods with some changing of insurable status during these intervals but by no means the seriously adverse effect which the Massachusetts Court found might be expected to follow application of the Massachusetts statute.

The Legislature, acting in an area where the state has a federally recognized responsibility, has determined that the policyholders' interest require this protection and the means used appear to be reasonably chosen to attain that purpose. The effect upon the Company of this aspect of the Legislature's effort appears to be minimal and incidental. The record does not demonstrate to us that the interest of the National Labor Relations Board in this respect is more than peripheral or that it is in conflict with the State's incursion into this area.[18]

We also conclude that as the moratorium provision is a reasonably chosen instrument fairly calculated to achieve a proper public purpose and as its effect on the Plaintiff's business has not been shown to be expected to result in a confiscation or a serious impairment of the Company's property rights, the moratorium provision does not offend constitutional due process. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed.

940 (1934); State v. Union Oil Co., 151 Me. 438, 120 A.2d 708 (1956); State v. Old Tavern Farm, Inc., 133 Me. 468, 180 A. 473 (1935). ●

We have considered the effects that this brief moratorium may have upon the Plaintiff's business, including the possibility of deprivation of some prepaid premiums for periods of time ranging from 1 to 30 days, the fact that the moratorium will give policyholders a choice of lapsing or paying after some days of nonprepaid coverage and the impact on nonstriking debit collectors. We are not convinced that these effects would so endanger the stability of the Company as to deny due process or to tip appreciably the balance in favor of striking debit agents in a labor dispute or that it would interfere with the Plaintiff's right to free collective bargaining.

We consider the state's creation of a 30-day moratorium during which policies will not lapse is a proper exercise of the police power and does not infringe upon federally preempted powers.

Plaintiff also urges that in limiting the operation of section 4751 to policies which go into effect on or after February 1, 1970 the Act creates a moratorium only for those who became its policyholders on or after February 1, 1970, and works a deprivation to those whose policies were purchased before that date. Plaintiff and some of the Amici argue that this situation effects a discrimination and a denial of equal protection to the pre-February 1, 1970 policyholders who are required by their contracts to pay their premiums in

---

18. In ITT Lamp Division of the International Telephone and Telegraph Corporation v. Minter, Commissioner, (1st Cir. 1970), 435 F.2d 989, the Plaintiff contended that the Defendant Commissioner of the Massachusetts Department of Public Welfare was wrongfully intruding in a labor dispute by making available welfare benefits to strikers otherwise qualified under Massachusetts statutes. The District Court found no irreparable injury and no reasonable probability of success on the merits and denied injunctive relief. The Circuit Court affirmed, saying that, wholly apart from the absence of evidence relating to the relative strength of state and federal interests and the extent of conflict, it had "substantial doubts" that granting welfare benefits significantly frustrated federal collective bargaining policy or that Congress must have been supposed to have deprived the state of power to serve such a substantial state interest.

advance (as sound actuarial principles necessitate) thus, as a class, making a greater contribution to the pool of corporate resources from which all policyholders' benefits must come.

■ It is well settled that the Fourteenth Amendment does not forbid a legislature from distinguishing between classifications if it is not done arbitrarily and is based upon a proper distinction, treating all individuals within the class alike. Wark v. State, Me., 266 A.2d 62 (1970); State v. King, 135 Me. 5, 188 A. 775 (1936).

■ We are not convinced that the Legislature made an unreasonable distinction when it chose not to attempt to disturb the parties' contractual rights and obligations under policies already in force and, instead, acted prospectively only for the benefit of a class consisting of new policyholders.

While we do not find in the moratorium provision of this statute the constitutionally impermissible qualities which led the Court in *Hancock* to declare the Massachusetts statute invalid, our statute also contains a "notice" provision not found in the Massachusetts law.

> "Notice. Within 10 days from the inception of a strike, notice of same containing instructions to make payment of premiums by mail shall be mailed to each affected insured by the insurer."

This provision gives us concern.

It appears to us that debit policyholders who receive the notice which a literal reading of the statute requires would conclude that they were no longer permitted (during the strike) to pay their premiums to nonstriking debit agents or to replacements for striking agents even though they desired to do so.

It is the contention of the Plaintiff that a literal construction of subsection 4 of section 4751 (the "notice" provision) would

bring a result unjustified under the police power and forbidden to the states under the National Labor Relations Act. The Defendant insists that there is a proper legislative interest in preventing the occurrence of lapses of policies during strikes and that the "notice" provision, affecting only one aspect of the business of the company and of the work of the debit agents, is reasonably designed to achieve this purpose under the police power.

We are certain that the Legislature in enacting subsection 4 did not intend any result other than the proper one of protecting the interests of the policyholders who may be caught in the middle of a labor-management controversy.

When we construe the language of subsection 4 in the light of this legislative purpose we find that we do not reach the constitutional issues which the Plaintiff feels are presented by the subsection.

■ It is a basic principle of construction that not only the intent but the policy of the Legislature should be ascertained and adopted. State v. Blaisdell, 118 Me. 13, 105 A. 359 (1919). We have said that the strict literal import of words must sometimes yield to legislative intent. Sullivan v. Prudential Insurance Company of America, 131 Me. 228, 160 A. 777 (1932); Union Trust Company of Ellsworth v. Philadelphia Fire and Marine Ins. Co., 127 Me. 528, 145 A. 243 (1929); State v. Day, 132 Me. 38, 165 A. 163 (1933). We do not consider that the language chosen by the Legislature here permits only one construction—one which appears unnecessary to the legislative purpose.

All of Plaintiff's policies contain the usual provision that payment of premiums shall be made either at Plaintiff's home office or to an agent authorized to receive payment.

A construction of subsection 4 which would require the Plaintiff to instruct affected policyholders to make premium payments *only* by mail would require the Com-

pany to announce that it was renouncing an obligation it had accepted under the contracts. It would necessitate a demand by the Company to the policyholders to abandon their contractual rights to continue to make their payments to agents if they choose to do so. We do not feel that we can ascribe to the Legislature any such intention—or that the language used requires such a construction.

■ The legislative purpose of avoiding the lapsing of policies because of the policyholders' unawareness of the existence of a strike and of the potential possible necessity of using other means of making premium payments during a prolonged strike would be achieved if the notice required by subsection 4 informs the policyholders that the payment of premiums *may* be made by mail during the strike, thus still leaving to the policyholder the choice of methods of payment. We consider it more reasonable to conclude that this was the legislative intention.

We construe the Legislature's words "instructions to make payment of premiums by mail" to require only instructions that payments of premiums *may* be made by mail during the strike.

When so interpreted we consider subsection 4 to present no constitutional problem in this respect.

Plaintiff also contends that section 4751 imposes vague and indefinite standards in violation of due process of law.

We said in Farmington Dowel Products Co. v. Forster Mfg. Co., 153 Me. 265, 136 A.2d 542 (1957):

"... It becomes apparent, therefore, that it is most important that the language of the statute inform the business man of ordinary intelligence whether his particular business operations are covered by the statute, and if so, what conduct on his part is specifically prohibited. If the statute is so vague and uncertain with respect to these matters

as to leave him to guess as to its application, it is unenforceable as to him. ..."

We cannot agree with Plaintiff that the language of section 4751 fails to satisfy this test.

■ We have considered each of the points at which Plaintiff contends the section is fatally imprecise.

We see no reason to doubt that the Legislature intended the Act to affect all policies which go into effect in the State of Maine on or after February 1, 1970 the premiums of which Plaintiff is by contract or practice obligated to collect through debit agents in this State. All holders of such policies are "affected" by the strike, at least to the extent that the moratorium provisions are applicable to them. There appears no intention to limit either the moratorium or the notice to affect only policyholders served by debit agents who have chosen to participate in the strike. The Legislature apparently concluded that the fluid day-by-day situations frequently encountered during strikes make it unsafe to attempt to distinguish, in extending its benefits, between policyholders whose debit agents are on strike and those whose debit agents have chosen to continue working.

Nothing in the statute as we construe it or in the notice prevents the debit agents who choose to continue to work from continuing to accept premium payments from policyholders who choose to continue to make payments to them. Those policyholders who do not so choose are entitled under their policies to send or bring their payments to Plaintiff's offices regardless of section 4751.

Clearly implicit is the Legislature's intention to restrict the benefits of the Act to policyholders who are currently served by Maine debit agents. Completely absent is any appearance of purpose—or need—to extend the benefits to persons who bought their policies in this state and who now

live elsewhere, unaffected by any strike of Maine debit agents.

We consider that the statute's definition of the term "lapse" adequately informs Plaintiff of its obligations in relation to that word.

The term "strike" as defined in subsection 2(C) confines the application of the Act to actual concerted work stoppages and excludes wildcat strikes by limiting strikes to those authorized by the labor organization according to the labor organization's own interpretation and application of its applicable internal rules. We do not find that the necessity of determination of whether employee activities constitute a strike, as the statute defines it, places an impossible burden upon the insurance company.

While subsection 4 is silent as to Plaintiff's notice obligations in the event a strike ends within 10 days of its inception, we are satisfied that the Legislature did not intend to require an entirely futile activity by Plaintiff. There is certainly no public interest in necessitating the sending of notice of a strike which has already ended. Plaintiff's uncertainty concerning its responsibility for notice if a second strike should occur following the termination of the first one can easily be set at rest. The statute requires the mailing of the notice following the inception of every strike by debit agents.

This matter was presented to us on Report with the stipulation that we are to render such decision as the rights of the parties require. We find that section 4751, as we have construed it, does not offend either federal or state constitutional necessities.

Plaintiff's appeal from the Order of the Commissioner disapproving of Plaintiff's proposed Endorsement Form is denied.

All Justices concurring.