STATE OF NEW YORK, Respondent, v LOCAL 1115 JOINT BOARD, NURSING HOME AND HOSPITAL EMPLOYEES DIVISION, et al., Appellants.

Second Department, March 14, 1977

*Charles R. Katz* for appellants.

*Louis J. Lefkowitz, Attorney-General (Daniel M. Cohen* and *Samuel A. Hirshowitz* of counsel), for respondent.

HOPKINS, Acting P. J. The Special Term granted a preliminary injunction, upon application of the Attorney-General on behalf of the State of New York, enjoining the defendants from engaging in a strike and related activities against the members of the Nassau County Health Facilities Association (Nassau) and other designated nursing homes, and, at the same time, it denied the defendants' cross motion to vacate a temporary restraining order and to dismiss the complaint. The defendant Local is a labor union and bargaining agent for the employees of the operators of nursing homes and health facilities which are members of Nassau.[1] The Local and Nassau have entered into a labor agreement governing employment conditions for the employees of the members of Nassau.

Nassau was threatened by the Local with a strike of the employees, engendered by the refusal of the members of Nassau to pay a cost of living adjustment and an increase in wages and contributions to the welfare fund, stipulated by the agreement. Acting under instructions from the State Commissioner of Health, the Attorney-General instituted this action to prevent the strike and, simultaneously, moved for a preliminary injunction for the same relief. The Local cross-moved, *inter alia,* to dismiss the complaint.

The Special Term granted the preliminary injunction and denied the cross motion. The Local appeals from the order, contending (1) that State courts are pre-empted by Federal law from exercising any jurisdiction in the field of labor relations within health care facilities and (2) that, in any event, the Special Term should not have interfered with the relations between the parties.

We affirm the order of Special Term. The State courts are not pre-empted from granting equitable relief to prevent the strike, since a demonstrable hazard to a significant number of the community existed, under the circumstances shown by this record.

---

1. In addition to the members represented by Nassau, there are individual nursing home employers which are bound by separate labor agreements with the Local. Since those agreements are similar in content and tenor to the agreement between Nassau and the Local, we treat the individual employers in the same light as Nassau.

## I.

Nassau is the collective bargaining agent for its members, which are operators of nursing homes in Nassau and Suffolk Counties. Together with the individual nursing homes described in the order appealed from, these operators serve more than 3,000 patients within their facilities. The Local is the collective bargaining agent for the employees of the members of Nassau and the individual nursing homes.

The Local and Nassau executed a bargaining agreement dated January 9, 1975, to be effective for four years beginning January 1, 1975. The agreement contained a broad arbitration clause, stating that "[a]ll complaints, disputes or grievances whatsoever of whatever kind or nature arising between the Union and the Employer concerning any provision of the contract, or with respect to any other acts, conduct or relations or terms or conditions of employment of whatsoever nature or otherwise, between the parties, directly or indirectly, shall be submitted for arbitration". Moreover, the agreement prescribed that "[d]uring the term of this agreement, the Union shall not call or authorize any strike against the Employer at the establishment covered by this Agreement and the Employer shall not effect any lockouts."

The agreement provided for a wage increase of $9 per week, as of January 1, 1976, and for an increase in the monthly contribution by Nassau to the Local's welfare fund, which provides benefits to the employees, including specified health insurance. In the event of the failure of Nassau to make the contribution to the welfare fund required under the agreement, it was provided that the Local should have the right to strike.

On or about December 16, 1975 Nassau wrote to the Local that its members had voted not to pay the wage increase or the increase in the contribution to the welfare fund. That decision, Nassau said, was "prompted by the freeze in the Medicaid rate which makes it impossible for the homes and health related facilities covered by the Agreement to pay the wage increases and other benefits provided in the collective bargaining agreement." Although this is not entirely clear from the record before us, Nassau's conclusion that Medicaid rates could not be raised was apparently based upon amendments to the rules and regulations promulgated by the State Commissioner of Health prohibiting rate revisions arising from labor negotiations after November, 1975.

The response of the Local to the refusal by Nassau to pay the increase was to call a strike of the employees to begin January 21, 1976. In addition the Local filed charges of unfair labor practices against Nassau with the regional office of the National Labor Relations Board pursuant to the 1974 amendments to the National Labor Relations Act (US Code, tit 29, § 158, subds [d], [g]). At the time the order under review was issued, no disposition of these charges had been made.

No request for arbitration of the dispute was made by either Nassau or the Local. Before the date set for the strike, the State Commissioner of Health served an order directing the Local not to engage in a strike against Nassau on the grounds that more than 3,000 patients were receiving care within the health facilities; that many of them were "sickly and gravely ill and in need of constant attention"; that there were not sufficient facilities to which the patients might be transferred; that there were no other persons sufficient in number, other than the members of the Local, to care for the patients; and that the safety and lives of the patients would, accordingly, be adversely affected. The State Commissioner also requested the Attorney-General to apply for injunctive relief pursuant to subdivision 5 of section 12 of the Public Health Law, stating that compliance by the Local with the order was not expected and that such an application was necessary in order "to prevent immediate and irreparable injury to patients in the event of non-compliance."

The Attorney-General then instituted this action for an injunction against the strike and, at the same time, moved for a preliminary injunction at Special Term. The Local resisted the application and cross-moved, *inter alia,* to dismiss the complaint. In its opposing papers it recited the breach of the bargaining agreement by Nassau and it contended that the State was pre-empted from acting in the labor dispute by the provisions of the National Labor Relations Act.

The Special Term granted the application for a preliminary injunction against the strike, though it denied any restraint on peaceful picketing, and denied the Local's cross motion to dismiss the complaint. Finding that the State Constitution (NY Const, art XVII, § 3) mandated that the protection of the health of its inhabitants was a matter of public concern, and that the Attorney-General was authorized to bring the action, Special Term held that a denial of the relief sought "would

cause tremendous suffering to the thousands of residents of the nursing homes and would disrupt the entire system."

## II.

On this appeal the Local urges that Special Term was without jurisdiction, under the doctrine of pre-emption, and that the order granting the preliminary injunction was improvidently issued, since no enjoinable labor dispute existed.

The Attorney-General, in reply, argues that Special Term properly restrained the Local from striking, because of the circumstances under which the health and safety of the elderly and chronically ill were gravely threatened. In effect, the Attorney-General urges that the State is not pre-empted by the provisions of the National Labor Relations Act where the lives and health of the patients in the health facilities are in immediate danger.

## III.

The doctrine of pre-emption stems from the supremacy clause in the Federal Constitution (US Const, art VI). The States may concurrently regulate areas affected by Federal law under the commerce clause, if the State regulation is not incompatible with the Federal regulation (see, e.g., *Automobile Workers v Wisconsin Bd.,* 336 US 245, 254; *United Workers v Laburnum Corp.,* 347 US 656; *Taggart v Weinacker's, Inc.,* 397 US 223, 227). Under this analysis, the question relates to the manner in which Congress has acted and whether the action of Congress necessarily precludes the States from a form of regulation *(Northern States Power Co. v Minnesota,* 447 F2d 1143, 1146, affd 405 US 1035).

Hence, we must address the Federal legislation to which the Local points as the basis of pre-emption against State action. Not until 1967 did the National Labor Relations Board (Board) take jurisdiction over profit-making health care institutions *(Butte Med. Props.,* 168 NLRB 266; *University Nursing Home,* 168 NLRB 263). That assumption of jursidiction was predicated upon the general power of the Board over businesses having a material effect on interstate commerce.

In 1974 Congress legislated directly in the field of labor disputes within the health care industry by enlarging the definition of health care institutions and by regulating the notice to be given by a labor union prior to a strike and the

notice of a labor dispute to be given to the Federal Mediation and Conciliation Service (US Code, tit 29, § 158, subds [d], [g]). Following the enactment of the legislation, the Board adopted the position that a State law prohibiting strikes against a voluntary hospital was pre-empted by the Federal amendments *(Matter of Minnesota,* 219 NLRB 1095).

New York requires compulsory arbitration of labor disputes arising in nonprofit health institutions (Labor Law, §§ 715, 716, subd 3, par [b]; see *Park Ave. Clinical Hosp. v Kramer,* 48 Misc 2d 826, mod on other grounds 26 AD2d 613, affd 19 NY2d 958). Profit-making health institutions, on the other hand, are not so regulated. New York, nevertheless, has enacted legislation limiting the power of courts to issue injunctions against strikes, following the Norris-LaGuardia Act, in order to meet the general criticism mounted against the unrestricted strike injunction (Labor Law, § 807). But it cannot be said that incompatible statutory provisions in the same context are present in the labor relations field between the New York State statutes and the Federal statutes. However, since the test of Federal power is whether the activity concerned is "arguably" subject to the Federal statutes *(San Diego Unions v Garmon,* 359 US 236, 245), we consider the issue before us in light of the Federal law and the constraints of federalism.

## IV.

The doctrine of pre-emption does not foreclose State jurisdiction over labor disputes altogether. Thus, in *San Diego Unions v Garmon (supra,* p 245), although the Supreme Court declared that State authority in labor relations was subordinate to the Federal statutory regulation, it also recognized (p 244) that State jurisdiction had not been displaced over matters peripheral to the regulation of labor relations or "deeply rooted in local feeling and responsibility". Accordingly, State courts may enjoin picketing using violent means *(Youngdahl v Rainfair, Inc.,* 355 US 131, 138; *Railroad Trainmen v Terminal Co.,* 394 US 369, 386). As Professor Cox has stated (Cox, Labor Law Preemption Revisited, 85 Harv L Rev 1337, 1355): "It is obviously too loose to assert that federal law excludes any state law that affects the balance of interests among management, union, employees, and public in union organization and collective bargaining. Jailing strikers for dynamiting a mine tipple or assaulting nonstrikers, indicting a union for a price-

fixing conspiracy, regulating insurance funds, and outlawing discrimination in employment may affect the outcome of a labor dispute or influence collective bargaining. Words privileged under NLRA section 8 (c) may give union leaders a cause of action for defamation. Such incidents ought not to be beyond state control merely because they occur in the course of an organizational campaign or labor dispute, or are covered by a collective bargaining agreement."

Moreover, in a larger sense, the demands of federalism impose a requirement that the States retain residual power under the Tenth Amendment to the United States Constitution to deal with local problems for the purpose of maintaining their sovereignty. Recently, in *National League of Cities v Usery* (426 US 833, 845) the Supreme Court said: "We have repeatedly recognized that there are attributes of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner." Further, the court said (p 851):

"We do not believe particularized assessments of actual impact are crucial to resolution of the issue presented, however. For even if we accept appellee's assessments concerning the impact of the amendments, their application will nonetheless significantly alter or displace the States' abilities to structure employer-employee relationships in such areas as fire prevention, police protection, *sanitation, public health,* and parks and recreation. These activities are typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services. Indeed, it is functions such as these which governments are created to provide, services such as these which the States have traditionally afforded their citizens. If Congress may withdraw from the States the authority to make those fundamental employment decisions upon which their systems for performance of these functions must rest, we think there would be little left of the States' ' "separate and independent existence" ' *Coyle, supra.* "(Emphasis supplied.)

The need to accommodate legitimate State interests in labor relations is further illustrated by the holding that both State and Federal courts have jurisdiction over actions arising out of breaches of labor contracts *(Arnold Co. v Carpenters,* 417 US 12, 18-20; *Dowd Box Co. v Courtney,* 368 US 502, 511),

even to the extent of enjoining a strike *(Boys Markets v Clerks Union,* 398 US 235, overruling *Sinclair Refining Co. v Atkinson,* 370 US 195). That jurisdiction has been effectuated by our courts (see, e.g., *Anchor Motor Freight v Local Union No. 445,* 5 AD2d 869; *Stewart Stamping Corp. v Uprichard,* 284 App Div 902; *Thaddeus Suski Prods. v Vola,* 47 Misc 2d 773, affd 24 AD2d 559). The jurisdiction so exercised is not subject to the requirements of the Norris-LaGuardia Act *(Textile Workers v Lincoln Mills,* 353 US 448, 458).[2]

These considerations lead to a discussion of the interests asserted by the Attorney-General in the field in which this litigation arose.

## V.

The State Constitution (art XVII, § 3) provides that "[t]he protection and promotion of the health of the inhabitants of the state are matters of public concern and provision therefor shall be made by the state and by such of its subdivisions and in such manner, and by such means as the legislature shall from time to time determine." The Legislature has directed the State Commissioner of Health to "take cognizance of the interests of health and life of the people of the state, and of all matters pertaining thereto" (Public Health Law, § 206, subd 1, par [a]), and to order the discontinuance by any person causing or engaging in "a condition or activity which in his [the Commissioner's] opinion constitutes danger to the health of the people" (Public Health Law, § 16).

In 1965 the Legislature declared that "[h]ospital and related services including health-related service of the highest quality, efficiently provided and properly utilized at a reasonable cost, are of vital concern to the public health" (L 1965, ch 795; Public Health Law, § 2800). In 1970 the Legislature made a

---

2. A recent law review note suggests that the doctrine of pre-emption should not bar the exercise of power by the States which they must use to carry out their functions as autonomous units within the Federal system (Municipal Bankruptcy, the Tenth Amendment and the New Federalism, 89 Harv L Rev 1871).

On the question of the authority and jurisdiction of a State court to issue an injunction *pendente lite* despite a claim of pre-emption, see *Barclay's Ice Cream Co. v Local 757* (41 NY2d 269, 270), in which the Court of Appeals, in affirming an order granting an injunction *pendente lite,* held: "We reject the proposition that under the doctrine of pre-emption our State courts must defer in this case to the exclusive competence of the National Labor Relations Board and thus are powerless to protect against the unlawful coercive activity designed by this union to erect an embargo on the flow of out-of-State goods into New York."

similar declaration concerning nursing homes (L 1970, ch 569; Public Health Law, § 2895), and provided for the licensing of nursing home administrators (Public Health Law, § 2896). In 1975 the Legislature extended the power of the State Commissioner over nursing homes (L 1975, ch 653; Public Health Law, § 2801, subd 3), and granted certain rights of action to patients in nursing homes (L 1975, chs 658, 649, 648; Public Health Law, §§ 2801-d, 2803-c). Moreover, the commissioner was charged with the responsibility to promulgate regulations relating to rates for patients in a nursing home, consistent with Federal standards, and to certify such rates to the State Budget Director in accordance with certain criteria (Public Health Law, § 2808). In short, the State Commissioner was empowered by legislative enactment to supervise and regulate fully and comprehensively the operation and management of nursing homes, to the end that the health of the patients might be completely promoted and protected.

Specifically, it is the duty of the Attorney-General, on request of the State commissioner, "to bring an action for an injunction against any person who violates, disobeys or disregards * * * any lawful notice, order or regulation" (Public Health Law, § 12, subd 5). Beyond that particular direction, however, the Attorney-General enjoys common-law authority *(Matter of Bennett v Merritt,* 173 Misc 355, 359-360, affd 261 App Div 824, affd 286 NY 647; *People v Miner,* 2 Lans 396), as well as statutory powers (Executive Law, § 63). Justices FRANKFURTER and HARLAN, in their concurring opinion in *United Steelworkers v United States* (361 US 39, 61), held that public nuisances might be enjoined at the suit of the Attorney General at common law (citing, e.g., *Attorney-General v Forbes,* 2 M & C, 123, 133; *Georgetown v Alexandria Canal Co.,* 12 Pet [37 US] 91; *Attorney General v Tudor Ice Co.,* 104 Mass 239), and that a public nuisance included a strike imperilling health or safety.

The legitimate interests of the government in the maintenance of the health and safety of the people were, in fact, enforced by the issuance of an injunction against a strike in *United Steelworkers v United States, supra).* Though Mr. Justice DOUGLAS alone dissented, his dissent was based upon the absence of factual grounds for the injunction; he did not disagree with the eight other members of the court that the District Court possessed the equitable jurisdiction to issue an injunction (p 73). The eight other members of the court, on the

other hand, found that section 208 of the Labor Management Relations Act (US Code, tit 29, § 178) permitted the issuance of an injunction against a strike when the national health or safety was shown to be endangered (p 40).

In summary, we believe that the Attorney-General, acting under proper instructions from the State Commissioner, may, in a case in which it is demonstrated that the State interests in promoting and protecting the health of its inhabitants are seriously threatened by a strike, seek an injunction and that, on such a showing, the Supreme Court may grant an injunction against the strike.

## VI.

The emphasis shifts then from a question of naked power to the question of discretion properly exercised by the court. The precise question in this case is whether the Attorney-General established grounds for the equitable intervention of the court. The Attorney-General's role was not as a representative of one of the protagonists in the dispute; his was the wider role of a representative of the State Commissioner of Health, who had discerned a peril to a significant number of patients residing in nursing homes which had leagued together as a bargaining unit to negotiate and deal with their employees joined in a labor union. There is thus present here a more pervasive danger affecting a substantial segment of an industry than would exist in the case of a single employer involved in a labor dispute with a single union. Hence, the circumstances trigger a greater impetus for the exercise of equitable powers by the court. As the Supreme Court of the United States stated in *Virginian Ry. v Federation* (300 US 515, 552): "More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern. That is testified to by the history of the legislation now before us, the reports of committees of Congress having the proposed legislation in charge, and by our common knowledge. Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved. *Pennsylvania v. Williams,* 294 U.S. 176, 185; *Central Kentucky Gas Co. v. Railroad Commisision,* 290 U.S. 264, 270-

273; *Harrisonville v. W.S. Dickey Clay Co.,* 289 U.S. 334, 338; *Beasley v. Texas & Pacific Ry. Co.,* 191 U.S. 492, 497; *Joy v. St. Louis, supra,* 47; *Texas & Pacific Ry. Co. v. Marshall,* 136 U.S. 393, 405-406; *Conger v. New York, W. S. & B. R. Co.,* 120 N.Y. 29, 32, 33; 23 N. E. 983."

The State Commissioner had strong reason to seek injunctive relief, knowing the large number of patients involved, their own incapacity to care for themselves, the lack of suitable facilities to accommodate their transfer and the imminent deadline for the beginning of the strike. Nor was this the usual case where the parties sought the preferred remedy of arbitration—a remedy provided for in their contract. Though the contract, literally read, did not prohibit a strike when Nassau refused to pay the increase due the welfare fund, neither did the contract exclude arbitration of the dispute under the broad terms defining the subjects of arbitration, and the Local did not invoke the peaceful intervention of court process by suing Nassau for damages arising out of a breach of contract.

It is not an answer that the Local filed an unfair labor charge with the regional office of the National Labor Relations Board and so invoked the jurisdiction of the Federal law. As we have seen, both State and Federal courts have initial jurisdiction in this field.[3] Besides this, the fact is that this record shows that the regional office, except for asking for a reply from Nassau, took no action in the dispute after the filing of the charges on or about December 19, 1975. The State Commissioner was thus in the untenable position of observing

---

3. The Local removed this action to the District Court for the Eastern District of New York. Upon motion of the Attorney-General, the action was remanded to the State Supreme Court by the District Court *(State of New York v Local 1115 Joint Bd.,* 412 F Supp 720, 724), saying: "Whether the Union's preemption contention is correct should be decided as a matter of defense in the State courts in the first instance, see *Application of State of New York, supra,* 362 F. Supp. [922] at 928; *Beacon Moving and Storage, Inc. v. Local 814 IBT,* 362 F. Supp. 442, 445 (S. D. N. Y. 1972); *City of Galveston v. International Organization of Masters, Mates & Pilots,* 338 F. Supp. 907, 909 (S. D. Tex. 1972), with ultimate recourse to the Supreme Court. State courts are obliged under the Supremacy Clause to follow federal law where applicable and there is no reason to believe that they are unwilling or incapable of so doing, see, e.g., *Pennsylvania v. Nelson,* 377 Pa. 58, 104 A. 2d 133 (1954), aff'd. 350 U.S. 497, 76 S. Ct. 477, 100 L. Ed. 640 (1956); *State ex rel. Rogers v. Kirtley,* 372 S. W. 2d 86 (Sup. Ct. Mo. 1963); *John Hancock Mutual Life Insurance Co. v. Commissioner of Insurance,* 349 Mass. 390, 208 N.E. 2d 516 (1965). See also *De Canas v Bica,* 40 Cal. App. 3d 976, 115 Cal. Rptr. 444 (2d Dist. 1974), revd. 424 U.S. 351, 96 S. Ct. 933, 47 L. Ed. 2d 43 (1976)." (See, also, *Barclay's Ice Cream Co. v Local 757* (41 NY2d 269, *supra.)*

the dispute ripen into a strike without the intercession of either arbitration or conciliation or other governmental agency process.[4]

The Federal statutes do not afford to the State an adequate avenue to obtain relief, and this factor is significant in the resolution of the question of pre-emption (see, note, Municipal Bankrupcy, the Tenth Amendment and the New Federalism, 89 Harv L Rev 1871). It seems clear that the process incorporated in the National Labor Relations Act would not have provided a quick and positive remedy to the situation facing the patients in the nursing homes.

There is a hint in the papers before Special Term that both Nassau and the Local were aware of the failure of the State Commissioner to increase rates in response to contractual rights arising after November, 1975, and that the failure reflected the worsening fiscal condition of the City of New York, other municipalities in the State and the State itself. The record does not delineate the nature of the financial crisis which a raise in the rates would portend, or, indeed, whether

---

4. The chronology was that the charge was filed on or about December 19, 1975; the reply of Nassau to the charge was requested by the regional office on December 30, 1975; the Attorney-General moved for injunctive relief at Special Term on January 21, 1976, returnable on January 28, 1976; the court decided the motion on February 5, 1976; and the order of the court was not made until May 21, 1976. Special Term was required to and could only act upon the facts and exigencies which had been presented to it at that time. Our review of Special Term's determination must be in the context in which it was made, as shown in and limited by the record on appeal. The principal exigency, of course, was that more than 3,000 patients, many of them "sickly and gravely ill and in need of constant attention", faced immediate eviction from the facilities in which they were being cared for; that there were not sufficient facilities to which they might be transferred; and that neither the employers nor the union nor the National Labor Relations Board had sought court protection for the patients facing displacement in a health and life-endangering situation. It was into this hiatus that the State Attorney-General moved and Special Term acted. As for Federal pre-emption, we note that appellants' main brief states that the Federal unfair labor practice charges were tried before an Administrative Law Judge on June 22 and 23, 1976. It further appears, in a letter from appellants' counsel to this court, dated January 31, 1977, that at the time of the argument of this appeal, October 19, 1976, the Federal Administrative Law Judge had not yet rendered a decision; in fact, the decision was not rendered until November 18, 1976 and it was not until January 28, 1977 that the board adopted his decision, finding the employers guilty of unfair labor practices and directing them to cease and desist and to take specified affirmative action.

Insofar as it appears from the record and briefs, during the protracted period in which the unfair labor practice charges were pending before the board, the latter did not move to oppose or to vacate the temporary injunction issued by the State court which would indicate that the board was content to let the temporary injunction stand.

Nassau and the Local regarded the strike as a weapon to force a raise. In the absence of a clear record we draw no inference in these respects.

For these reasons we think the Special Term properly granted a preliminary injunction against a strike. We note, too, that Special Term properly denied an injunction against picketing, as there was no proof in this record of violent or coercive conduct.

Accordingly, we affirm the order insofar as it is appealed from, without costs or disbursements.

HAWKINS, J. (dissenting). I dissent and vote to reverse the order insofar as it is appealed from on the ground that Special Term was without jurisdiction, under either State or Federal law, to have granted a preliminary injunction. The order restrains the defendant labor union and its officers from "engaging * * * in any strike" or "concerted stoppage of work, or concerted slow down" against some 20 individual proprietary nursing homes, most of which are members of an association. These nursing homes are proprietary facilities. They are business ventures, conceived and operated for profit; they are neither religious, community nor eleemosynary institutions.

Defendant Local 1115 Joint Board, Nursing Home and Hospital Employees Division (Union) is a labor union. The Nassau County Health Facilities Association, Inc. (Association) is a trade association representing these privately owned nursing homes. It is neither plaintiff, defendant, intervenor, nor *amicus,* however, despite the fact that the Association and the Union have enjoyed collective bargaining relations for an appreciable number of years. The current contract is for a four-year period which commenced on January 1, 1975 and is to terminate on December 31, 1978.

The contract provides, *inter alia,* that as of January 1, 1976, in addition to wage increases, the employers are to pay an additional $10 per month, per employee, into a welfare fund. From this fund, employees and their dependents receive medical, hospitalization, dental, optical, drug and life insurance benefits.

Although the contract contains a "no strike" clause, the collective bargaining agreement expressly provides that, in the event the payments to the welfare fund are not made on or before the 10th day of each current month, "upon five (5)

days written notice by Certified Mail to the Employer * * * the Union, notwithstanding anything to the contrary contained in this Agreement shall have the right to strike and remove the employees from the establishment until the Employer pays the full amount owed".

By letter dated December 16, 1975, the Association informed the Union that the contractually mandated additional welfare fund contributions would not be paid. Thereafter, there followed substantially similar letters to the same effect from each of the individual nursing homes. The justification for the Association and the individual employers repudiating their contractual obligations was that it was "prompted by the freeze in Medicaid rate which makes it impossible for the homes and health related facilities covered by the agreement to pay the wage increases and other benefits provided in the collective bargaining agreement."

Special Term, at the outset of its opinion, notes that although the Association would "normally be the party to bring an action for injunctive relief to prevent a strike", the Association refused to bring such action and "the State of New York through its Attorney General has stepped in and instituted this proceeding."

The opinion then cites subdivision 5 of section 12 of the Public Health Law, which provides that the Attorney-General, upon the request of the Commissioner of Health, is to bring an action for injunctive relief for a willful disregard or disobedience of provisions of the Public Health Law. Reference is then made to section 3 of article XVII of the Constitution of the State of New York, providing that the protection and promotion of the health of the inhabitants of the State are matters of public concern.

The Commissioner of Health's order directing the Union members not to strike is predicated upon subdivision 1 of section 206 of the Public Health Law. The decisional authority then cited by Special Term is *Matter of Bennett v Merritt* (173 Misc 355, affd 261 App Div 824, affd 286 NY 647). Special Term, however, noted that "the Attorney General contends that the case before us is one of first impression."

The history of courts intervening in labor disputes and handing down injunctions is well covered in Kheel on Labor Law. (See, particularly, 18 Business Organizations, Kheel, Labor Law [Matthew Bender], chs 2, 4.) Briefly, the early predicate for the Court of Chancery in England intervening

was the Elizabethan doctrine of conspiracy. In the United States, in both the Colonial and post-Revolutionary periods, the same rule was applied. Subsequently, the basis was interference with property and contractual rights; hence, any combination, real or putative, by employees was deemed so objectionable as to warrant injunctive relief.[1] Mr. Justice OLIVER WENDELL HOLMES, while on the Massachusetts Supreme Court, in a dissenting opinion, stated, with respect to the legality of strikes *(Plant v Woods,* 176 Mass 492, 505): "I think the strike a lawful instrument in the universal struggle of life * * * I think it lawful for a body of workmen to try by combination to get more than they now are getting * * * and to that end to strengthen their union by the boycott and the strike."

Thereafter, labor, after ceaseless agitation, persuaded Congress to amend the Sherman Anti-Trust Act, which had long served as a justification for injunctions, by enacting the Clayton Anti-Trust Law. Hailed as labor's Magna Charta, both Congress and labor sanguinely believed that since the statute provided "that labor is not a commodity", this would bar most injunctions. This hope was soon dispelled, for the courts continued handing down injunctions with their former profligacy. It was not until the enactment of the Norris-LaGuardia Act in 1932 (47 US Stat 70), expressly barring injunctive relief where a "labor dispute" existed, as defined in section 7 of that statute, that there was a surcease. As noted by Kheel, thereafter Federal courts yielded their fortress of injunction. The rights, privileges and responsibilities devolving upon labor in its efforts to improve its lot were further expanded, defined and refined by the Wagner Labor Relations Act. It definitively gave labor the right to unionize and to seek collective bargaining agreements without judicial intervention, save for stated exceptions. New York's "Little Wagner Act" incorporated Federal law into New York labor law (Labor Law, art 20).

The law antedating Norris-LaGuardia is distilled in the dissent of Mr. Justice BRANDEIS, with Justices HOLMES and CLARKE concurring, in *Duplex Co. v Deering* (254 US 443, 484-485). In construing the Clayton Act, he stated:

"This statute was the fruit of unceasing agitation, which extended over more than twenty years and was designed to

---

1. See Frankfurter and Greene, The Labor Injunction chapter 1, for the "Early Use of the Injunction" (pp 17-24).

equalize before the law the position of workingmen and employer as industrial combatants. Aside from the use of the injunction, the chief source of dissatisfaction with the existing law lay in the doctrine of malicious combination, and, in many parts of the country, in the judicial declarations of the illegality at common law of picketing and persuading others to leave work. The grounds for objection to the latter are obvious. The objection to the doctrine of malicious combinations requires some explanation. By virtue of that doctrine, damage resulting from conduct such as striking or withholding patronage or persuading others to do either, which without more might be *damnum absque injuria* because the result of trade competition, became actionable when done for a purpose which a judge considered socially or economically harmful and therefore branded as malicious and unlawful. It was objected that, due largely to environment, the social and economic ideas of judges, which thus became translated into law, were prejudicial to a position of equality between workingman and employer; that due to this dependence upon the individual opinion of judges great confusion existed as to what purposes were lawful and what unlawful; and that in any event Congress, not the judges, was the body which should declare what public policy in regard to the industrial struggle demands."

Special Term and the Attorney-General have thus ignored almost a century of the history of labor law. The only novel impression derived is that *Matter of Debs* (158 US 564), although not cited, has been resurrected. In *Debs* we had government intervening in a labor dispute on the putative premise of a paramount public interest. In that landmark decision, the Attorney General of the United States, on the ostensible ground that the United States mails had been interfered with by the Pullman Company strikers—and after having previously arranged that the trains would carry United States mail—persuaded the court to grant a sweeping injunction. Subsequently, in defiance of the injunction, Eugene V. Debs, the then leader of the strike, was found to be in contempt and was jailed for several months. *Inter alia,* it was this very intervention by government into a private labor dispute in *Debs*—and its progeny—which gave much historical justification for the ultimate enactment of the Norris-La-Guardia Act.[2]

---

2. Eugene V. Debs, who entered jail a so-called "pure trade unionist", i.e., nonpolitical and concerned only with union recognition, terms and conditions of employment,

Under the Norris-LaGuardia Act Congress severely circumscribed and limited the equitable powers of Federal courts to grant injunctions where, indeed, and as then defined, there existed a "labor dispute". Irrespective of the merits of the dispute, and absent any violence, no injunction lies. Subsequently, Congress enacted the Wagner Labor Relations Act, thereby creating the National Labor Relations Board. Labor hailed it as its Magna Charta, for the Wagner Act recognized the right of labor unions to bargain collectively. Included in the nexus of collective bargaining rights is, of course, the right to strike. The subsequent limitations of labor's untrammeled right to strike have resulted from either statute or decisional law. The Taft-Hartley, Landrum-Griffith, and Labor Management Relations Acts, and other statutes affecting such industries as railroads and mining, have imposed limitations on strikes arising out of secondary boycotts, etc., or have regulated internal union matters; but these are not relevant to the issue at bar.

New York enacted the New York State Labor Relations Act, article 20 of the Labor Law—the so-called "Little Wagner Act"—which is virtually a verbatim enactment of the Federal Wagner Act. Where public employees are involved, confronted with the possibility of vital and essential public services being withheld or curtailed, the State enacted the Taylor Law. That statute, of course, has no applicability at bar for the employees here are neither public employees nor civil servants; they are employees engaged in private industry, albeit an industry more affected with the public weal and, hence, more subject to governmental regulations than most industries.

We are presented with an extraordinary situation. The Association and the individual employers have declined to assert their rights, if any, to enjoin the Union. However, they have prevailed upon the Commissioner of Health of the State of New York to set the machinery in motion to compel the Attorney-General to initiate the action. Thus, we have *Matter of Debs* (158 US 564, *supra)* revived after some eight decades of interment. All that remains, it would appear, is to resuscitate the *Danbury Hatter's* case.[3]

---

etc., emerged as a full-blown radical who later was several times the Socialist Party candidate for president. (The Bending Cross, Ray Ginger, Rutgers University Press, 1940.) See, also, Labor in America, by Professor Foster Rhea Dulles (Crowell Co., New York, 1966), who states (p 179): "Debs had become convinced while in jail that the cause of labor was hopeless under capitalism."

3. *Loewe v Lawlor*, 208 US 274.

Special Term has not only disregarded decades of evolving labor law, but also a very recent and most pertinent statute enacted by Congress: the Health Care Amendments to the National Labor Relations Act. By that statute, Congress has pre-empted Federal jurisdiction over the nursing home industry. As attested to by the congressional debates, it also gave the right to strike to employees of privately owned and operated health care facilities. Any doubts as to the congressional intent are dispelled by the appellants' copious quotations from the congressional debates. Not without interest are the remarks of then Congressman Gerald Ford, who, in support of the bill, stated:

"The health industry is clearly within the flow of interstate commerce.

"The National Labor Relations Board so held when it successively exercised jurisdiction over private proprietary hospitals, over private proprietary nursing homes, and over nonprofit nursing homes.

"The Supreme Court so held when in Maryland against Wirtz it sustained the power and authority of Congress to bring hospital employees under the 1966 amendments to the Fair Labor Standards Act.

"And Congress so held when, from 1964 to 1972, it brought nonprofit hospitals under the coverage of a series of Federal Laws—from the Equal Employment Opportunity Act to the 1972 amendments to social security, Medicare and Medicaid programs."[4]

That Federal pre-emption was intended is evident from then Senator Mondale's efforts to exempt Minnesota from the statute, for that State had legislation affecting the industry. In commenting upon the rejection of his amendment, the Senator from Minnesota stated: "Unfortunately, S. 3023 will preempt the Minnesota Charitable Hospitals Act. While I fully support S. 3023, I do so reluctantly. While I believe that it is imperative that we extend National Labor Relations Act coverage to health care industries, it is unfortunate that we do so at the expense of preempting an effective and progressive labor relations measure in the State of Minnesota."[5]

The Department of Health of the State of New York itself

---

4. 120 Cong Rec 4589, 4590 (Daily Ed, May 30, 1974).

5. 120 Cong Rec S6991 (Daily Ed, May 2, 1974).

recognized that prior State law had been superseded by the new legislation for, in its Memorandum 75-78, it stated:

"As of August 1, 1974, all non-profit health facilities have been covered by the provisions of the National Labor Relations Act, and prior state law became inoperative. The right to strike, to organize and to bargain collectively are now guaranteed by the Act. Federal policy is clear: health facilities and their employees are expected to negotiate, with mediation as a last resort. The binding arbitration provisions of state law are gone. Collective bargaining, just as in other industries, is the standard procedure."

The basic concept of the statute follows that of several other statutes designed to prevent strikes in industries affected with a public interest, or in which disruption would have a serious impact on national security, or on the economy. A "cooling-off" period is prescribed during which the Union is barred from striking. There is thus provided an appreciable period of time within which the employer can make other arrangements. As noted by Congressman Thompson in the course of the debates: "There are built into this legislation sufficient mandatory notices, mandatory mediation, and mandatory 10 day strike period, so that there is a period of at least 3 months between the termination of a contract and a renewal of that contract before it is posssible that there could be a hospital strike" (120 Cong Rec H4588 [Daily Ed, May 30, 1974]).

Both Special Term and the Attorney-General invoke the potential threat to the welfare of the patients: the concept repeatedly employed is often expressed as "transfer shock". Nowhere, however, in the Attorney-General's presentation is there any reference to the Commissioner of Health's efforts, if any, to mediate the dispute or to call upon the State Board of Mediation to use its good offices. Confronted with the Association's ukase that it would not honor the contract, apparently the Commissioner of Health and the Attorney-General determined that their sole recourse was to turn back the clock.

This court, in *Uzzillia v Commissioner of Health of State of N.Y.* (47 AD2d 492), was confronted with the threatened consequences of so-called "transfer shock" as justification for noninspection or noninterference. We there noted (p 499): "One method, of course, is providing the patients with reasonable notice when closing down a home in which the patients have long resided."

Another and more efficacious alternative to avoid such

consequence is simply to have all parties honor their contractual obligations as well as to comply with public health codes and regulations.

The emergency, if, indeed, one exists, was contrived. The problem was several months in the making. The employers, having determined that they would not honor the contract, apparently made no provisions whatsoever for providing alternative care for their patients. In essence, what has occurred is that the State of New York, by its Commissioner of Health and Attorney-General—and possibly aided and abetted by the Union—has been maneuvered and euchred into acting as intermediary in a synthetic crisis. The purpose is to pressure the State into increasing Medicare and Medicaid benefits; presumably, if successful, the employers would then honor their contractual obligations and make the payments into the welfare fund.

Central to the conclusion by the majority of my brethren to affirm, is the view that Congress, not having expressly preempted jurisdiction, State courts, under the police power, have "residual power" to act, the subject matter being "peripheral" or "deeply rooted in local feeling and responsibility", citing *San Diego Unions v Garmon* (359 US 236). In addition to *Garmon,* as authority that State jurisdiction attaches and, hence, affirmance lies, there are cited *National League of Cities v Usery* (426 US 833) and the Harvard Law Review article by Professor Archibald Cox, entitled Labor Law Preemption Revisited (85 Harv L Rev 1337).

*Garmon (supra)* had its genesis in the efforts of a union to compel an employer to enter into a so-called "sweetheart contract". The *Garmon* opinion cited was written the second time that case came before the Supreme Court of the U..ited States. Previously (in 353 US 26) the Supreme Court had reversed the California Supreme Court, which had affirmed an award of both injunctive relief and damages. The Supreme Court of the United States, on its first review of *Garmon,* struck the injunction and remanded the case to the California Supreme Court solely on the question of the damages that had been awarded. Thereafter, the California Supreme Court reaffirmed the damages granted. On *Garmon's* second round, the Supreme Court of the United States reversed. The basis for the reversal, and the principal holding there, is that although the lines of demarcation between Federal and State jurisdiction are ill-defined, where Congress has not explicitly rejected

jurisdiction, it does not necessarily fall to the States. Prior to any real distillation of *Garmon* and its value as a universal rule, it must be understood that there was no proceeding there for certification or any unfair labor charge before the National Labor Relations Board (NLRB) brought by either the employer or the union. Furthermore, *Garmon* involved picketing and not a strike. The majority's language relating to paramount jurisdiction of the NLRB is from Mr. Justice FRANKFURTER's opinion. However, Mr. Justice HARLAN wrote a concurring opinion, joined in by Justices CLARK, WHITTAKER and STEWART, which would have conferred greater powers upon the States in these labor disputes.

The discussion of *Garmon* and its many progeny revolves about the jurisdiction of the NLRB. Those cases involved issues of union recognition, appropriate collective bargaining units, etc. At bar, the union and the employers have had collective bargaining contracts for many years. There is no question of union recognition or of designating an appropriate bargaining unit. In fact, there is an NLRB proceeding pending. A complaint of an unfair labor practice has been issued.[6]

*National League of Cities v Usery* (426 US 833, *supra*) has no applicability. That case did not involve a labor dispute but, rather, whether Congress could expand the Fair Labor Standards Act to include State or municipal employees. There the State was in the relationship of employer vis-à-vis employee. The reference in *National League of Cities* by the Supreme Court to the States' obligations and powers to provide such essential services as police protection, fire protection, etc., all relate to the municipality as the direct employer of the policemen, firemen, etc. Apart from it not being a "labor law case", the same conclusion would not have been reached had the sanitary services been provided by private employers. In fact—assuming interstate commerce—private cartmen and sanitation employees are subject to the Fair Labor Standards minimum wage law. There is no question but that Congress—or the State—can legislate minimum wages, hours, etc., for persons engaged in health-related occupations where performed by the private sector; jurisdiction, Federal or State, depends upon whether the commerce is interstate or intrastate.

---

6. The NLRB, on January 28, 1977, sustained the charge that the employers had engaged in unfair labor practices. The employers were directed to "cease and desist from their unfair labor practices" and to take other affirmative action.

It is significant to note the language virtually at the beginning of Professor Cox's law review article. Speaking of section 7 of the National Labor Relations Act, after noting that section 7 guaranteed freedom to bargain collectively, he states (citing *Hill v Florida,* 325 US 538), that it is directed "against state law as well as employer interference" (85 Harv L Rev 1337, 1340). The article then continues (p 1340): "Thereafter it was only a short and logical step to rule that state law cannot be used to restrict employees' exercise of the right to engage in 'concerted activities.' The guarantee applies to nearly all peaceful primary strikes and picketing in support of normal collective-bargaining objectives[19] *even when they occur in a dispute threatening to cut off essential public services.*[20]" (Emphasis supplied.) The following cases were cited in the footnotes: "19) *International Union, UAW v O'Brien,* 339 US 454 (1950). 20 *Street Employees Division 1287 v Missouri,* 374 US 74 (1963); *Street Employees Division 998 v Wisconsin Employment Relations Bd.,* 340 US 383 (1951)."

Professor Cox's discussion of *Garmon* places it in its proper context (p 1349): "In *Garmon* the Court temporarily escaped the dilemma by subdividing the field of union activities neither protected against employer and state interference by section 7 nor prohibited by section 8(b). Into one subcategory it placed activities which are obviously neither protected nor prohibited. As to these, the Court reserved opinion, thus ostensibly ducking the truly fundamental question. Where the activities are 'arguably' protected by section 7 or 'arguably' prohibited by section 8(b), the Court held, only the NLRB may make the initial determination whether the activity is protected, prohibited, or in the gap left without regulation by federal law. From this premise, the Court went on to rule that no other tribunal could deal with arguably protected or prohibited activities by way of either injunction or damages".

The entire question of pre-emption has no applicability to the instant appeal. The defendant union has observed all of the statutory prerequisites as to notice, the cooling-off period, etc. There is no question but that the collective bargaining agreement does not bar a strike for the employers' failure to make the payments into the welfare fund. The collective bargaining agreement explicitly so provides. Thus the language of labor law cases involving illegal strikes is irrelevant, for this union is not bound by any no-strike clause. As previously noted, there is no question here of union recogni-

tion or of a union imposing a contract upon a reluctant employer and unwilling emloyees, as obtained in *Garmon.*

The majority stresses the doctrine of Federal pre-emption as determinative of the issue at bar, citing, *inter alia, Automobile Workers v Wisconsin Bd.* (336 US 245), *United Workers v Laburnum Corp.* (347 US 656) and *Taggart v Weinacker's, Inc.* (397 US 223). *Automobile Workers* involved an injunction to restrain a union from calling meetings during working hours, thereby interfering with production. The State of Wisconsin, by statute, had expressly prohibited such conduct but, with equal specificity provided that it was perfectly lawful for the union to call a strike and for the employees to walk out. Obviously, it was directed against "slow downs" or "sit-ins", but not against strikes. *United Workers* held that, under the Labor Management Relations Act, the States were not deprived of jurisdiction in ordinary tort actions for damages, such as in coercion. There the union officials had threatened physical violence against officers of a construction company. Significantly, only damages were awarded; no injunction was issued. *Taggart,* a *Per Curiam* opinion, is of no import, for, after stating that the controversy was moot, the Supreme Court acknowledged that it had erred in granting the petition for a writ of certiorari. In any event, the issue there was resolved on the basis of the sidewalk being so narrow—"4 feet to 5.5 feet wide"—that the picketing obstructed customers from entering the store premises. *Northern States Power Co. v Minnesota* (447 F2d 1143, affd 405 US 1035) did not involve a labor dispute; it held merely that Congress could pre-empt the field of regulating radioactive releases by nuclear power and, consequently, that the State of Minnesota was without authority to enforce its own regulations in that area.

Other judicial authorities cited in the majority's opinion, I believe, are either distinguishable or inapplicable.

*Arnold Co. v Carpenters* (417 US 12) involved a proceeding by an employer to enjoin a union from violating a no-strike provision. The Supreme Court held that the NLRB did not have exclusive jurisdiction, but that the State court could enjoin the breach of a collective bargaining agreement containing a no-strike clause. At bar, the contract specifically allows the Union to strike if the employer fails to make the increased welfare fund payments.

*Dowd Box Co. v Courtney* (368 US 502) merely affirms the position that there may be concurrent Federal and State

jurisdiction in an action to enforce a collective bargaining agreement.

In *Boys Markets v Clerks Union* (398 US 235) the Supreme Court held that the Norris-LaGuardia Act did not prohibit injunctive relief where the grievance in question was subject to adjustment and arbitration under a collective bargaining agreement and where, additionally, the employer was ready to proceed with arbitration at the time the injunction had been sought and obtained. Here, neither the Union nor the employer has sought arbitration; nor, for that matter, does it appear that the Commissioner of Health or the Attorney-General initiated any efforts for arbitration or mediation.

*Steelworkers v United States* (361 US 39) is inapplicable. Under section 208 of the Labor Management Relations Act, an injunction lies at the instance of the Federal Government since the strike affected an "entire industry or a substantial part thereof". Furthermore, by the very terms of the statute, it had to be shown that it would "imperil the national health or safety". Granted, a substantial number of patients are here involved; but neither an entire industry nor the national health is affected.

In citing *Virginia Ry. v Federation* (300 US 515), resort is had to an opinion rendered in March, 1937. I submit that the majority misconstrues that holding, for there the injunction was sustained against the employer, who was restrained from maintaining a company union and from negotiating with any representatives of employees other than their "true representatives." The majority's opinion has an extended quote from *Virginian Railway.* I suggest the quoted matter—apart from its presently dubious viability, some 40 years having elapsed—is best appreciated by noting the very preceding and concluding matter (p 552): "With the coercive influence of the company union ended, and in view of the interest of both parties in avoiding a strike, we cannot assume that negotiation, as required by the decree, will not result in agreement, or lead to successful mediation or arbitration, or that the attempt to secure one or another through the relief which the district court gave is not worth the effort."

The matter immediately following the part quoted by the majority should also be included (pp 552-553): "The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief. It

is for similar reasons that courts, which traditionally have refused to compel performance of a contract to submit to arbitration, *Tobey v. Bristol, supra,* enforce statutes commanding performance of arbitration agreements. *Red Cross Line v. Atlantic Fruit Co.,* 264 U.S. 109, 119, 121; *Marine Transit Corp. v. Dreyfus,* 284 U.S. 263, 278."

In affirming, we would not be simply maintaining the *status quo.* What is achieved—abiding the trial—is to compel the union members to continue working under superseded benefits and to do so despite the employers' pledged, contractual obligations.

If Special Term had dealt with the problem so as to maintain the *status quo,* it would have also enjoined the employers, compelling them to make the contractually mandated payments into the welfare fund, *pendente lite.* If that had been done, it could be more cogently urged that, in affirming, the *status quo* would be maintained. If the argument is advanced that the employers were not before the court, they might have been added as parties and the injunction made contingent upon payment into an escrow or trust fund. In fact, the very agreement couples the right to strike with the requirement that an employer "who becomes delinquent", "shall be required to post bond to secure future payments."[7]

Congressional power over labor relations is, of course, derived from its constitutional authority to regulate interstate commerce. Absent from the majority's opinion are any real considerations of the Norris-LaGuardia Act, the Wagner Act, and the subsequent modifications by the National Labor Relations Act and the Taft-Hartley Act. None of these statutes, in my opinion, barred the Union and the employer from entering into a collective bargaining agreement. Apart from the constitutional prohibitions, both Federal and State, against impairing obligations under a contract, a collective bargaining agreement is entitled to no lesser "tender solicitude" or greater "benign neglect" than is any other contract.

It is not necessary for the court to enter into the maze where Federal jurisdiction ends in response to local considerations, or where the State may intercede, for, under the facts, an injunction does not lie either under Federal or State law.

In sum, assuming, *arguendo,* that State jurisdiction attaches under *Garmon,* there is here present a "labor dispute" as

---

7. Section 22 of the collective bargaining agreement.

defined by article 20 of the Labor Law—the Little Wagner Act —and, absent violence, no injunction may be issued. Additionally, the reserve power of the State, under the Tenth Amendment, has no applicability, for the NLRB has assumed jurisdiction by entertaining an unfair labor practice charge.

Special Term's citation as authority for granting the injunctive relief is *Matter of Bennett v Merritt* (173 Misc 355, affd 261 App Div 824, affd 286 NY 647, *supra)*. That case involved an application by the Attorney-General directed against a County Court Judge who, after a trial, sentenced a defendant to a prison term and then suspended sentence. The common-law powers of the Attorney-General there discussed have no relevancy whatever to the Attorney-General's power to intervene in a labor dispute.

The contract at bar expressly excludes the dispute at hand from the "no-strike" clause applicable to other provisions of the contract. There is neither constitutional nor statutory prohibition against the Union striking; nor is there any contractual provision barring the Union from exercising such collective bargaining rights.

Assuming, *arguendo,* that State jurisdiction lies, there is present a "labor dispute" under article 20 of the Labor Law— the Little Wagner Act—and, without violence, no injunction should have been issued. Thus, Special Term was without jurisdiction, either under State or Federal law, to have granted a preliminary injunction. Accordingly, I vote to reverse the order of Special Term granting the preliminary injunction and to dismiss the complaint.

In concluding, it is well to recall the dedication to Mr. Justice BRANDEIS by Frankfurter and Greene in their seminal text, The Labor Injunction (New York, McMillan Co., 1930), which had a profound influence on subsequent legislation limiting judicial intervention in labor disputes: *"To Mr. Justice Brandeis for whom law is not a system of artificial reason, but the application of ethical ideals with freedom at the core."*

DAMIANI and RABIN, JJ., concur with HOPKINS, Acting P. J.; HAWKINS, J., dissents and votes to reverse the order insofar as it is appealed from, deny plaintiff's motion for a preliminary injunction and grant appellants' cross motion to vacate the temporary restraining order and to dismiss the complaint, with an opinion, in which SHAPIRO, J., concurs.

Order of the Supreme Court, Suffolk County, entered May

24, 1976, affirmed insofar as appealed from, without costs or disbursments.